## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| Arquest, Inc., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Case No. 07 CV 11202 (CM) |
| v. | ) | |
| | ) | |
| Kimberly-Clark Worldwide, Inc., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## KIMBERLY-CLARK WORLDWIDE'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................ 1

II.     KCWW Is Not Subject to Personal Jurisdiction In New York ........................... 2

   A.    There Is No Specific Personal Jurisdiction Under CPLR § 302 Because
        Arquest's Products, Not KCWW's Products, Are At Issue In This Case ..................... 2

   B.    There Is No General Jurisdiction Under CPLR § 301 Because KCGS Is Not An
        Agent Or A Mere Department Of KCWW ...................................................... 4

     1.    KCGS Is Not An Agent Of KCWW Because KCWW Would Not Market
         Or Sell Products If KCGS Was Not Available ........................................ 6

     2.    KCGS Is Not A "Mere Department" Of KCWW Because The Required
         Ownership, Financial Dependency, Interference, And Control Are Not
         Present ............................................................................................. 8

   C.    Exercising Personal Jurisdiction Over KCWW Does Not Comport With
        Constitutional Due Process .............................................................................. 9

III.    Conclusion ..................................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

*Beacon Enters., Inc. v. Menzies,*
    715 F.2d 757 (2d Cir. 1983) ..................................................................... 3, 4

*Delagi v. Volkswagenwerk AG of Wolfsburg*, Germany,
    29 N.Y.2d 426, 328 N.Y.S.2d 653, 278 N.E.2d 895 (1972)........................... 9

*Frummer v. Hilton Hotels Int'l., Inc.*,
    19 N.Y.2d 533, 227 N.E.2d 851 (1967)...................................................... 6

*International Shoe Co. v. Washington*,
    326 U.S. 310 (1945)................................................................................ 8

*IP Co. LLC v. General Communication, Inc.*,
    No. 07 CIV. 2372, 2007 WL 3254387 (S.D.N.Y. Oct. 31, 2007) .................... 3

*Klonis v. National Bank of Greece, S.A.*,
    492 F.Supp.2d 293 (S.D.N.Y. 2007) ......................................................... 9

*Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*,
    918 F.2d 1039 (2d Cir.1990) .................................................................... 7

*McGowan v. Smith*,
    52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)........................... 3

*Medpay Systems, Inc. v. Medpay USA, LLC*,
    NO. 06-CV-1054, 2007 WL 1100796 (E.D.N.Y. Mar 29, 2007)...................... 10

*Melnick v. Adelson-Melnick*,
    346 F.Supp.2d 499 (S.D.N.Y.2004) .......................................................... 4

*Shoe Co. v. Washington*,
    326 U.S. 310 (1945)................................................................................ 8

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2d Cir. 2000) .................................................................... 6, 7

## Statutes

CPLR § 301............................................................................................ passim

CPLR § 302............................................................................................ passim

**Annotated Statutes**

CPLR § 301 (McKinney 2008)........................................................................................... 5

CPLR § 302 (McKinney 2008)........................................................................................... 3

## I. INTRODUCTION

Kimberly-Clark Worldwide, Inc. ("KCWW") is not subject to personal jurisdiction in New York. First, there is no specific personal jurisdiction over KCWW under CPLR § 302. This case does not "arise from" sales of products by KCWW, or its sister corporation, Kimberly-Clark Global Sales, Inc. ("KCGS"), in New York. Arquest, Inc. ("Arquest") filed this case seeking a declaratory judgment that *Arquest's* products do not infringe KCWW's patents, and that KCWW's patents are invalid. Therefore, the only sales that this suit could "arise from" for purposes of specific personal jurisdiction under CPLR § 302 are *Arquest's* sales of its diapers and training pants (which are irrelevant to whether there is personal jurisdiction over KCWW). Because this case does not "arise from" the sale of KCWW or KCGS products in New York, there is no specific personal jurisdiction over KCWW under CPLR § 302.

Second, there is no general personal jurisdiction over KCWW under CPLR § 301. KCWW is not doing business in New York. Any assertion of general personal jurisdiction over KCWW, therefore, must be based on its relationship with KCGS. The facts established at the evidentiary hearing did not define an agency relationship between KCWW and KCGS and, therefore, can not be used to establish personal jurisdiction over KCWW in New York. KCGS is not an agent of KCWW in New York because KCWW would not step into KCGS's place if KCGS was unavailable. If KCGS stopped marketing and selling products in New York, KCWW is not in a position to start marketing and selling products. Rather, KCWW is a toll manufacturer and has no marketing or sales force. Consequently, even though the products of the overall Kimberly-Clark enterprise (the collection of all Kimberly-Clark entities) would continue to be marketed and sold by someone, it would not likely be by KCWW.

Furthermore, although KCWW receives some benefit from the sales by KCGS into New York, this alone is not enough under the law to establish personal jurisdiction. Arquest cites to

no precedent for basing jurisdiction based solely on such a tenuous contact. Nor does that argument comport with common sense. If the receipt of a "benefit", by itself, were sufficient to bring an otherwise unamenable defendant before a New York Court, then other entities and individuals would be subject to personal jurisdiction based on KCGS's sales – including, for example, General Mills, Disney Corporation, and every shareholder of Kimberly-Clark Corporation. However, neither the case law nor considerations of due process support such a strained analysis.

Finally, there is no general personal jurisdiction over KCWW based on the theory that KCGS is not a "mere department" of KCWW. KCGS is not a "mere department" of KCWW because the required ownership, financial dependency, interference with executive personnel, and control over operational policies required by the "mere department" analysis are not present between KCWW and KCGS in this case.

Because there is no general personal jurisdiction over KCWW under CPLR § 301, and because there is no specific personal jurisdiction under CPLR § 302, there is no personal jurisdiction over KCWW in this case.

## II. KCWW Is Not Subject to Personal Jurisdiction In New York

### A. There Is No Specific Personal Jurisdiction Under CPLR § 302 Because Arquest's Products, Not KCWW's Products, Are At Issue In This Case

There is no specific personal jurisdiction over KCWW in New York under CPLR § 302, which provides that for "a cause of action ***arising from*** [the business transacted within the state] … a court may exercise personal jurisdiction over any non-domiciliary, who … transacts any business within the state." CPLR § 302 (emphasis added). The key element for purposes of considering specific personal jurisdiction under CPLR § 302 is that the specific cause of action at issue must arise out of business transacted in New York by the defendant. Put another way,

"essential to the maintenance of a suit against a nondomiciliary under [CPLR § 302(a)(1)] is the existence of some articulable nexus between the business transacted and the cause of action sued upon." *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981). CPLR § 302 insures that a party will be subject to personal jurisdiction in New York when the specific cause of action at issue arises from that party's transaction of business in New York. Advisory Committee Notes, CPLR § 302 (McKinney 2008) (CPLR § 302(a) "is designed to take advantage of the constitutional power of the state of New York to subject non-residents to personal jurisdiction when they commit acts within the state").

The requirements for specific personal jurisdiction under CPLR § 302 are not met in this case. Although KCWW acknowledges that KCGS diapers and training pants (and many other products as well) are marketed and sold throughout New York every day by KCGS, this does not establish specific personal jurisdiction in New York in this declaratory judgment action relating to Arquest's products and KCWW's patents.[1] As the Second Circuit and this Court have ruled in similar cases, claims which seek declaratory judgment relief concerning (1) the Plaintiff's (accused infringer's) own products, and (2) the Defendant's intellectual property, bear no articulable nexus with, and do not arise from, the Defendant's (or in this case a related entitity's) business activities in New York. *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 765 (2d Cir. 1983) (finding no articulable nexus between the defendant's "shipment of goods to New York and [the accused infringer's] defensive declaratory judgment action"); *IP Co. LLC v. General Communication, Inc.*, No. 07 CIV. 2372, 2007 WL 3254387, at *5 (S.D.N.Y. Oct. 31, 2007)

---

[1]    As explained through the testimony of KCWW officer John Wesley, KCGS is the only Kimberly-Clark entity that sells products in New York covered by KCWW's intellectual property. (Transcript of April 4, 2008 Proceedings (hereinafter "Tr."), p. 37:12-17, Ct. Dkt. No. 30, Attached as Exhibit 1).

(finding that the declaratory judgment action did not arise from the defendant's New York activity).

Arquest filed this case seeking a Declaratory Judgment that *Arquest's manufacture and sale of its private label diapers and training pants* do not infringe KCWW's patents. (Complaint, Ct. Dkt. No. 1, ¶¶ 1, 15-35).  In this case, therefore, *KCWW's toll manufacture of,*[2] *and KCGS's sale in New York of, Huggies® diapers and Pull-Ups® training pants* are not relevant to the specific personal jurisdiction analysis.

In fact, Arquest has not provided any plausible basis for specific jurisdiction over KCWW under CPLR § 302 despite having the opportunity to fully question Mr. Wesley regarding any potential KCWW transaction of business that has an articulable nexus to the causes of action in the present suit.  Arquest has therefore not met its burden of proof in order to sustain personal jurisdiction under CPLR § 302.  *Beacon*, 715 F.2d at 762.[3]

### B. THERE IS NO GENERAL JURISDICTION UNDER CPLR § 301 BECAUSE KCGS IS NOT AN AGENT OR A MERE DEPARTMENT OF KCWW

There is also no general personal jurisdiction in New York over KCWW under CPLR § 301.  Under CPLR § 301, general personal jurisdiction over a non-domiciliary defendant such as KCWW may be exercised if the defendant engages in business activities within New York which are "continuous and systematic."  *Beacon*, 715 F.2d at 762.  To prove general personal

---

[2]    KCWW is a toll manufacturer of some KCGS products.  A toll manufacturer is a manufacturer who manufactures products on a contract basis.  (Tr., p. 11:12-22).  Under the toll manufacturing agreement between KCWW and KCGS, KCGS owns all raw materials, work in process and finished goods.  (*Id.* at 10:20-25, 11:1-10).

[3]    "Prior to the holding of an evidentiary hearing, the plaintiff need only make a *prima facie* showing that jurisdiction exists."  *Melnick v. Adelson-Melnick*, 346 F.Supp.2d 499, 502 (S.D.N.Y.2004).    However, after "there has been discovery on the issue of [personal] jurisdiction, the plaintiff's *prima facie* showing must include 'an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant.'  The plaintiff cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be 'factually supported.'"  *Id.*

4

jurisdiction under CPLR § 301, the plaintiff must demonstrate that the defendant is "doing business" in New York "with a fair measure of permanence and continuity." *Id.* (citations omitted).

As explained above, KCGS is the only Kimberly-Clark entity that sells products in New York which are covered by KCWW's intellectual property.[4] (Tr., p. 37:12-23). The fact that KCGS is subject to general personal jurisdiction in New York based on its sale of products such as Huggies® diapers and Kleenex® tissue, however, does not mean that KCWW (the only defendant in this suit, and the owner of the intellectual property at issue in this declaratory judgment action), is subject to general personal jurisdiction in New York.

As KCWW discussed in its motion and reply, and which was uncontroverted at the April 4, 2008 hearing, KCWW itself has no direct connections with New York. Any finding of general personal jurisdiction over KCWW in this case must therefore be founded upon indirect contacts; in particular, the finding must be based on KCWW's relationship with KCGS. "Two theories have evolved to permit the assertion of general personal jurisdiction over foreign corporations that may be deemed to be doing business in New York vicariously as a result of their relationship with affiliated companies in New York." CPLR § 301, C301:9 (McKinney 2008). "The first such theory is the 'mere department' doctrine, [and . . . t]he second theory is that of agency." *Id.* The relationship between KCWW and KCGS does not satisfy either legal basis to exercise personal jurisdiction over KCWW.

---

[4]    KCWW licenses all of its intellectual property to KCGS. (Tr., p. 18:23-25, 19:1-4). Similarly, KCWW has licensed some of its intellectual property to companies unrelated to Kimberly-Clark and it is possible that these other unrelated entities sell products covered by KCWW's patents in New York. (*Id.* at 19:22-25, 20:1-8). In addition, KCGS also licenses intellectual property from companies unrelated to Kimberly-Clark for KCGS's products. (*Id.* at 27:15-19).

### 1. KCGS Is Not An Agent Of KCWW Because KCWW Would Not Market Or Sell Products If KCGS Was Not Available

The evidence establishes that the relationship between KCGS and KCWW does not constitute the "agency relationship" of CPLR § 301. To establish an agency relationship under CPLR § 301, Arquest must show that KCGS acts as KCWW's agent to such an extent that KCGS "renders services on behalf of [KCWW] that go beyond mere solicitation and are sufficiently important to [KCWW] that [KCWW] would perform equivalent services if no agent were available." *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (citing *Frummer v. Hilton Hotels Int'l., Inc.*, 19 N.Y.2d 533, 537, 227 N.E.2d 851, 853-54 (1967)). Arquest has not met this burden.

KCGS and KCWW are sister corporations. (Tr., p. 7:9-10). Both corporations are subsidiaries of Kimberly-Clark Corporation. (*Id.* at 42:20-22). The two corporations are separate legal entities and each corporation has a separate board. (*Id.* at 44:1-3). Furthermore, KCWW has no control over who is an executive of KCGS or over KCGS's management, sales force, marketing, etc. (*Id.* at 21:25, 22:1-15). Similar to Disney and other companies unrelated to KCGS that license intellectual property to KCGS, KCWW's control over KCGS is limited to the intellectual property licensor-licensee relationship. (*Id.*).

Although the sales and marketing by KCGS are important to KCWW, KCWW would not "perform equivalent services" if KCGS were unavailable. First, it is undisputed that KCWW does not sell or market any products. (*Id.* at 18:15-18). KCWW is a toll manufacturer for products that KCGS owns throughout the entire manufacturing process (from raw materials to finished goods) and then markets and sells. (*Id.* at 10:20-25, 11:1-22). In addition, KCWW is not the only manufacturer of KCGS products. Other Kimberly-Clark entities also manufacture

products for KCGS.  (*Id*. at 12:19-25).  KCGS also has the right to have products manufactured by certified suppliers that are not Kimberly-Clark entities.  (*Id*. at 17:7-10).

Second, although KCWW owns the Kimberly-Clark enterprise's intellectual property and would like to see products sold that bears its intellectual property, (*Id.* at 41:9-11), and despite the fact that "Kimberly-Clark Corporation or the enterprise would find a way to sell the product [if KCGS did not exist,]" (*Id.* at 39:19-25, 40:1), *that does not mean that KCWW itself would sell or market the products*.  In fact, the products could be marketed and sold by any of the numerous Kimberly-Clark corporate entities.  (*Id.* at 39:8-16).  According to Mr. Wesley, KCWW is not situated to sell or market products if KCGS did not exist.  (*Id.* at 41:12-21).  KCGS, therefore, cannot be considered an agent of KCWW.

Moreover, the fact that KCWW receives a "benefit" by virtue of its licensee's, KCGS's, sales in New York cannot alone provide a basis for general personal jurisdiction.[5]  Receipt of a benefit is relevant to the general personal jurisdiction analysis under what the Second Circuit refers to as a "solicitation plus" theory.  *See Wiwa*, 226 F.3d at 98 (citing *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1044 (2d Cir.1990)).  Under the "solicitation plus" theory, a "business relationship with a New York entity does not provide a sufficient basis for jurisdiction at least in the absence of a showing that that company has become an agent or division of the company over which the plaintiff seeks to exercise personal jurisdiction."  *Landoil*, 918 F.2d at 1046 (holding that the relationship with a sister corporation located in New York "does not provide a basis for jurisdiction as a component of the 'plus'

---

[5]    At the time of the filing of this suit, KCWW received a flat fee for licensing its intellectual property to KCGS regardless of the amount of KCGS's sales, and compensation from KCGS for the products that it toll manufactured for KCGS.  (Tr., pp. 25:4-25, 26:1). Additionally, KCWW's revenue from its toll manufacturing relationship with KCGS comprises "a relatively small number from [KCWW's] perspective."  (*Id*. at 26:22-25, 27:1-6).

portion of the solicitation-plus test for jurisdiction"). In this case, because KCWW does not solicit any business in New York, a "solicitation plus" theory would, instead, first require a finding that KCGS is an agent of KCWW – a fact that Arquest cannot establish as described above.

The rationale for the "solicitation plus" theory is well-founded in the jurisdictional underpinnings of "notions of fair play and substantial justice." *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). If receipt of a benefit alone was enough for general jurisdiction, it would mean that personal jurisdiction in New York would extend over Disney Corp. and General Mills Co. (by virtue of their license or co-promotion agreements with KCGS), and every Kimberly-Clark Corporation shareholder, as a result of KCGS's sales of products in New York. (*See* Tr., pp. 26:11-16, 33:18-20).

Consequently, Arquest's apparent argument (*see* Arquest's Opposition, Ct. Dkt. No. 20, p.7) that general personal jurisdiction based solely on "benefits" KCWW receives related to KCGS's sales in New York is misplaced and unsupported by the case law. In particular, the *Wiwa* case does not support Arquest's assertion that benefits alone are a "central issue" for finding general jurisdiction.

### 2. KCGS IS NOT A "MERE DEPARTMENT" OF KCWW BECAUSE THE REQUIRED OWNERSHIP, FINANCIAL DEPENDENCY, INTERFERENCE, AND CONTROL ARE NOT PRESENT

KCGS also is not a "mere department" of KCWW.[6] When determining whether a corporation is a "mere department" of a related corporation, courts consider four factors: 1) ownership; 2) financial dependency; 3) interference with executive personnel and failure to observe corporate formalities, and 4) control over operational policies. *See Klonis v. National*

---

[6] Arquest has not raised this theory of general personal jurisdiction. KCWW addresses the theory here in the event Arquest argues the theory in their cross-supplemental brief.

*Bank of Greece, S.A.*, 492 F.Supp.2d 293, 300 (S.D.N.Y. 2007). In this case, none of the factors support finding general jurisdiction over KCWW based on the "mere department" doctrine.

First, the "ownership" factor is not met because the two corporations are sister corporations; they are not parent and subsidiary. *See Delagi v. Volkswagenwerk AG of Wolfsburg*, Germany, 29 N.Y.2d 426, 432, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895, 897 (1972) ("[the New York Court of Appeals] has never held a foreign corporation present on the basis of control, unless there was in existence at least a parent-subsidiary relationship."). Second, KCWW is not financially dependent on KCGS. Rather, as Mr. Wesley testified, the majority of KCWW's revenue comes through Kimberly-Clark Corporation foreign subsidiaries. (Tr., p. 17:11-24). Third, because KCWW and KCGS are sister corporations, neither is a "parent" which interferes in the selection and assignment of the other's employee's or executive personnel, nor do they fail to observe corporate formalities. KCWW and KCGS are separate legal entities and KCWW does not have any control over who is an employee or executive of KCGS. (*Id.* at 21:25, 22:1-15, 23:12-14). Fourth and finally, KCWW does not exercise control over KCGS marketing and operational policies because KCWW does not direct KCGS' sales or marketing efforts. (*Id.* at 43:21-25). Because none of the four factors support a finding that KCGS is a "mere department" of KCWW, there is no general personal jurisdiction over KCWW under this theory.

In sum, neither the agency theory nor the "mere department" theory supports general personal jurisdiction over KCWW in this case.

### C. EXERCISING PERSONAL JURISDICTION OVER KCWW DOES NOT COMPORT WITH CONSTITUTIONAL DUE PROCESS

Because there is no specific or general personal jurisdiction under New York's long arm statutes, this Court does not need to address constitutional requirements for personal jurisdiction.

*See, e.g., Medpay Systems, Inc. v. Medpay USA, LLC*, No. 06-CV-1054, 2007 WL 1100796, at

*8 (E.D.N.Y. Mar 29, 2007). Even if this Court reaches the due process analysis, KCWW's

contacts with New York do not satisfy the constitutional requirements of due process because

KCWW has not "purposefully directed" its actions at residents of New York. (See KCWW's

Reply in Support of Motion to Dismiss or Transfer, Ct. Dkt. No. 27, pp. 10-11).

## III. CONCLUSION

For the foregoing reasons, and those in KCWW's original memorandum and reply, there

is no personal jurisdiction over KCWW in New York. KCWW respectfully requests that the

Court dismiss this action, and allow the case to proceed in the Northern District of Texas where

all parties are subject to personal jurisdiction.

Dated: April 18, 2008                                    Respectfully submitted,


                                                _____s/ Gregory W. Gilliam_____
                                                Edmund M. O'Toole (EO 7939)
                                                Matthew T. McLaughlin (MM 6241)
                                                Gregory W. Gilliam (GG 2857)
                                                **Venable, LLP**
                                                Rockefeller Center
                                                1270 Avenue of the Americas
                                                25th Floor
                                                New York, NY 10020
                                                Tel. (212) 307-5500

                                                Marc S. Cooperman, Esq.
                                                 *mcooperman@bannerwitcoff.com*
                                                Janice V. Mitrius, Esq.
                                                 *jmitrius@bannerwitcoff.com*
                                                Thomas J. Lerdal, Esq.
                                                 *tlerdal@bannerwitcoff.com*

**Banner & Witcoff, LTD.**
10 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel: (312) 463-5000
Fax: (312) 463-5001

**Attorneys for Plaintiff**
**Kimberly-Clark Worldwide, Inc.**

# EXHIBIT 1

1

844darqh

HEARING

1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   ARQUEST, INC.,
3
4                   Plaintiff,           New York, N.Y.
4
5               v.                        07 Civ. 11202 (CM)
5
6   KIMBERLY-CLARK WORLDWIDE,
6   INC.,
7
7                   Defendant.
8
8   ------------------------------x
9
9                                        April 4, 2008
10                                       11:55 a.m.
10
11  Before:
11
12                      HON. COLLEEN MCMAHON,
12
13                                       District Judge
13
14                      APPEARANCES
14
15  DICKSTEIN SHAPIRO LLP
15       Attorneys for Plaintiff
16  BY:  BRIAN D. SIFF
16       RICHARD LaCAVA
17       PETER LAMBRIANAKOS
17
18  BANNER & WITCOFF, LTD
18       Attorneys for Defendant
19  BY:  MARC S. COOPERMAN
19       JANICE V. MITRIUS
20
20  VENABLE LLP
21       Attorneys for Defendant
21  BY:  MATTHEW T. McLAUGHLIN
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

844darqh
HEARING

1              THE COURT:  OK.  Appearances, please.
2              MR. SIFF:  Brian Siff, from Dickstein Shapiro,
3    representing the plaintiff, Arquest, Inc., your Honor.
4              MR. LaCAVA:  Richard LaCava, from Dickstein Shapiro,
5    representing the plaintiff, Arquest, Inc.
6              MR. LAMBRIANAKOS:  Peter Lambrianakos, also from
7    Dickstein Shapiro, on behalf of Arquest.
8              MR. McLAUGHLIN:  Good morning, your Honor.  Matthew
9    McLaughlin, from Venable, for Kimberly-Clark Worldwide.
10             MR. COOPERMAN:  Good morning, your Honor.  Marc
11   Cooperman, from Banner & Witcoff, for Kimberly-Clark Worldwide.
12             MS. MITRIUS:  Janice Mitrius, from Banner & Witcoff,
13   on behalf of Kimberly-Clark Worldwide, your Honor.
14             THE COURT:  OK.  Everybody, have a seat.
15             This case was originally on for an initial conference,
16   and it is my habit to dispose of motions to dismiss or transfer
17   at initial conferences, and I had such a motion and it was
18   fully briefed and we have been going through the papers.  And
19   as you know, because I sent you out a little note, there is an
20   awful lot missing from the movant's papers relating to the
21   motion to dismiss for lack of personal jurisdiction.
22             I confess, as an old user of many Kimberly-Clark
23   products for I think the entirety of my life, I was surprised
24   to get the motion.  The moving affidavits are a lot more
25   interesting for what they don't say than for what they do say,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

844darqh
HEARING

1  and we need to get such matters cleared up before we can act on
2  that motion.
3       But I was particularly disturbed this week to receive
4  copies of briefs that had been filed in front of one of my
5  comrades down in Texas where someone, who never spoke to me,
6  opined that I was going to transfer this case to Texas.
7       If I have personal jurisdiction, I'm not transferring
8  this case to Texas.  All right?  Let me make that very clear
9  from the get-go, from the outset.  I love patent cases.  I
10  enjoy patent cases.  I have fun with patent cases.  And I am
11  happy to keep patent cases.  I am not allergic to patent cases.
12  I'm getting a patent case decision out today.
13       So we need to resolve the issue of personal
14  jurisdiction if in fact it is still on the table.
15       Is it still on the table?
16       MR. COOPERMAN:  It is, your Honor.
17       THE COURT:  Then, Mr. McLaughlin, you have a lot of
18  questions to answer.
19       MR. McLAUGHLIN:  Your Honor, I'm sorry.  I'm
20  Mr. McLaughlin.  I'm local counsel.
21       THE COURT:  I'm so sorry.
22       MR. COOPERMAN:  I had moved for Mr. Cooperman's pro
23  hac admission, your Honor, and it has been granted.  May he
24  address the Court directly?
25       THE COURT:  He absolutely can.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

844darqh
HEARING

```
 1          MR. COOPERMAN:  Thank you, your Honor.
 2          First, I want to apologize on behalf of Kimberly-Clark
 3  Worldwide and Kimberly-Clark Global sales.  It was presumptuous
 4  of us to tell the district court in Texas how we thought you
 5  would rule.
 6          At the time we filed our opposition in Texas, we
 7  thought we were being balanced.  We didn't ask the Texas court
 8  to rule on the motion to dismiss and get the case going.  We
 9  said, no, this is an issue for the judge in New York and you
10  should wait for the judge in New York to rule.  Her ruling will
11  control.  So we felt that we were getting downtown.  But in
12  retrospect, we should have --
13          THE COURT:  Look, guys, enough of these reasons, let's
14  move on to the merits.
15          MR. COOPERMAN:  Your Honor, we have brought up an
16  officer from Kimberly-Clark Worldwide, whose name is John
17  Wesley -- he is assistant secretary of Kimberly-Clark
18  Worldwide -- to address those questions that you have raised in
19  your note that you sent to us.  So he is here prepared today to
20  testify however you want.
21          THE COURT:  Great.
22          MR. COOPERMAN:  In addition, we have Vicki Margolis.
23  You may know her name.  She is one of our declarants.  She is
24  in-house counsel, in-house patent litigation counsel for
25  Kimberly-Clark.  She joined us from Neenah, and Mr. Wesley has
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

5
844darqh
HEARING

 1    flown up from Dallas to be here today.
 2              We also have, if necessary, Mr. Misun, whose
 3    declaration you mention in your note.  He is not here today
 4    because you said you didn't want him here
 5              THE COURT:  Correct.
 6              MR. COOPERMAN:  But he is available by phone if we
 7    need to ask him any questions, as well.
 8              THE COURT:  OK.  Fine.
 9              Well, let's hear from someone.  You know what I'm
10    interested in.
11              That moving affidavit has an awful lot of holes in it,
12    and if you want to convince me that I lack personal
13    jurisdiction over the holder of the patents for the diaper that
14    is in danger of becoming oblivious, its trademark, because
15    everybody calls all disposable diapers Huggies, then you've got
16    a lot of questions to answer.
17              MR. COOPERMAN:  I understand, I think, where your
18    Honor's concerns are at.
19              We are dealing with two entities here --
20    Kimberly-Clark Worldwide, who is the named defendant, who is
21    the owner of the intellectual property, and Kimberly-Clark
22    Global Sales.  Mr. Misun's declaration, which your Honor has
23    pointed out was deficient, only goes to half of the story,
24    absolutely focuses on Kimberly-Clark Worldwide.  We viewed that
25    as the central issue.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

6

844darqh
                          HEARING
1              In our reply brief --
2         THE COURT:  No, it left a whole lot of issues open
3    about Kimberly-Clark Worldwide.  Kimberly-Clark Worldwide owns
4    these patents.  The patents, unless we are going to use them to
5    paper the executive washroom, the patents are of no value to
6    Kimberly-Clark Worldwide unless they are being exploited.  I
7    would be shocked to learn that it was not the business of
8    Kimberly-Clark Worldwide to get those patents out there.
9              And according to your papers, this is not just a
10   holding company for intellectual property, this is a company
11   that manufactures something.  And if I were a betting person, I
12   would be betting that they manufacture diapers and that they
13   manufacture diapers that incorporate the patented features and
14   use the patented process that are in your patent.
15             Am I right so far?
16        MR. COOPERMAN:  You are correct, your Honor.
17        THE COURT:  Well, isn't that amazing.
18             Now, so the exploitation of the patents is obviously
19   done by getting those diapers out there in the marketplace, and
20   we all know that diapers, Huggies, are sold everywhere in the
21   known universe because it is the goal of Kimberly-Clark, the
22   conglomerate, to get every little baby's bottom covered in a
23   Huggie, as opposed to any other kind of diaper, right?
24        MR. COOPERMAN:  As an enterprise, I would agree with
25   that.  Of course, there are different entities and that's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

844darqh
                           HEARING
 1    part --
 2            THE COURT:  Sure there are different entities
 3    involved, but if Kimberly-Clark Worldwide, which owns the
 4    patent, manufacturers the diapers that get sold in the State of
 5    New York, as part of its business activity manufactures those
 6    diapers, I just don't see how you can say it's not doing
 7    business in New York, if only through the good offices of its
 8    sister corporation -- am I correct?  Sister corporation?
 9            MR. COOPERMAN:  Kimberly-Clark Global Sales a sister
10    corporation, that is correct.
11            THE COURT:  Right.  If only for the good offices of
12    its sister corporation, which I'll bet owns, in a technical
13    sense, the cotton and the plastic and the stuff that's used to
14    manufacture the diapers, and then sells the diapers, right?
15            MR. COOPERMAN:  It does that and it also does more,
16    your Honor.
17            THE COURT:  Oh, good.  OK.
18            Well, I'm happy to hear anything that you all want to
19    tell me about this.  But those facts are relevant facts and
20    they are conspicuously absent from your moving papers, which is
21    why I said that the moving papers appeared as they were trying
22    to be deliberately obfuscatory.  I think I was right about
23    that.
24            MR. COOPERMAN:  I disagree, your Honor, that we were
25    trying to be deliberately obfuscatory --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8

844darqh
HEARING

```
 1              THE COURT:  Then you were accidentally obfuscatory.
 2              MR. COOPERMAN:  We thought we were addressing the
 3   central issue, and we will certainly address Kimberly-Clark
 4   Global Sales and the relationship with Worldwide in our reply
 5   brief.
 6              THE COURT:  Let's hear from the folks that you've
 7   brought up here, OK?
 8              MR. COOPERMAN:  Certainly.  Would you like us to put
 9   them on the stand?
10              THE COURT:  That would be just great.
11              What is your name, sir
12              THE WITNESS:  John Wesley.
13              THE COURT:  Mr. Wesley, good morning or good
14   afternoon.  Won't you take a seat.
15     JOHN W. WESLEY,
16         called as a witness by the defendant,
17         having been duly sworn, testified as follows:
18              THE CLERK:  Please state and spell your name for the
19   record.
20              THE WITNESS:  My name is John Wesley, J-O-H-N
21   W-E-S-L-E-Y.
22              THE CLERK:  Thank you.
23   DIRECT EXAMINATION
24   BY MR. COOPERMAN:
25   Q.  Mr. Wesley, would you please tell the Court what your
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

```
      844darqh                    Wesley - direct
 1  position is and why we brought you as a representative of
 2  Kimberly-Clark Worldwide?
 3  A.  Yes.  I am an officer of both Kimberly-Clark Worldwide and
 4  Kimberly-Clark Global Sales.  I am the assistant secretary for
 5  both entities.
 6  Q.  And have you had any responsibility in restructuring of the
 7  organization?
 8  A.  Yes.  I'm also the chief counsel of corporate transactions
 9  for Kimberly-Clark Corporation, and in that role I worked on a
10  project where we restructured our operations in the U.S.,
11  including the way in which we license our technology and
12  manufacture products.
13  Q.  Would you tell the Court, please, what products precisely
14  does Kimberly-Clark Worldwide manufacture?
15  A.  Kimberly-Clark Worldwide has three manufacturing
16  facilities, all of which are located in the western United
17  States.  There is one in Fullerton, California, a suburb of Los
18  Angeles, and that facility manufactures tissue products, I
19  think Kleenex.
20          THE COURT:  Kleenex, my favorite Kimberly-Clark
21  product.
22          THE WITNESS:  We appreciate that.
23          THE COURT:  Love it.  Love it.  Couldn't live without
24  it.
25  Q.  Does that manufacture any diapers or training pants?
```

844darqh                    Wesley - direct

1    A.  No, no diapers or training pants at that facility.  We call
2    that a tissue mill.
3    Q.  What other facilities?
4    A.  We have a facility in Everett, Washington and in that
5    facility they make paper towels and paper napkins, like Scott
6    towels.
7    Q.  Any other facility?
8    A.  And there is one -- there is a third facility and that
9    facility is located in Ogden, Utah, a suburb of Salt Lake, near
10   Salt Lake.
11   Q.  And what is manufactured --
12   A.  That facility is a diaper facility.  It manufactures
13   diapers and training pants.
14   Q.  So there are three facilities and the only one that
15   manufactures diapers and training pants is Ogden, Utah, is that
16   correct?
17   A.  That is correct.
18   Q.  Who does K-C Worldwide manufacture for?  Who are K-C
19   Worldwide's customers?
20   A.  K-C Worldwide manufactures all of its products at the
21   request of Kimberly-Clark Global Sales.  Theres a supply
22   agreement pursuant to which Global Sales purchases all of the
23   raw materials that are used in the manufacturing process,
24   delivers those to the manufacturer, which was the three
25   facilities I just described, and then sells those products, the

844darqh                        Wesley - direct
1   finished goods inventory.  Worldwide sells the finished goods
2   inventory or delivers it to Global Sales.
3   Q.  Could you briefly walk us through --
4             THE COURT:  Again, I just want to -- Global Sales
5   purchases the raw materials and delivers them to Worldwide in
6   Ogden, Utah, which manufactures the diapers and then sells the
7   diapers back to Global Sales?
8             THE WITNESS:  I misspoke when I said "sells them."
9   They are owned by Kimberly-Clark Global Sales from the very
10  beginning.
11            THE COURT:  That's what I wanted to clarify.
12            THE WITNESS:  The way you would think of this
13  manufacturing process, and it is not unique to Kimberly-Clark,
14  it is called toll manufacturing.  So the entity that is selling
15  the goods, in this case K-C Global Sales, has contracted with
16  manufacturers to make products for it, and it has contracted
17  with K-C Worldwide to make its products, both the tissue and
18  everything else, as well as the diapers, out of Ogden.  And for
19  that K-C Worldwide is compensated by Kimberly-Clark Global
20  Sales on a cost-plus basis, which is, again, fairly common for
21  coat packers or contract manufacturers or other companies that
22  have toll manufacturing structures.
23  Q.  So can you walk us through how an order would originate
24  with the customer and how that order would then be passed along
25  through the Global Sales entities and the Worldwide entities

844darqh                        Wesley - direct
1   and ultimately result in products going back to the customer?
2   A.  I think I can.
3           All sales will originate out of Global Sales.  We
4   would call that the customer-basing part of our business.  They
5   are the ones --
6   Q.  They talk to the customers?
7   A.  Not the customers, they talk to the Wal-Marts, the Safecos,
8   the Costcos, the Edgars, and others, and Global Sales would
9   hopefully secure an order from them.  And then it would do the
10  forecasting process or communicate back with the manufacturing
11  facilities that it has, in effect, retained to manufacture
12  products for it, and provide them with orders that they need
13  for delivery.  So products then get made and they go off to the
14  distribution centers and ultimately get shipped to the end
15  customer.
16  Q.  So the communication that Global Sales has with the
17  manufacturers, that is sometimes worldwide, is that correct?
18  A.  The manufacturer is sometimes worldwide, that is correct.
19  Q.  Does Global Sales have any products manufactured by anyone
20  besides Kimberly-Clark Worldwide?
21  A.  It does, it has -- there is approximately 20-plus
22  additional mill locations in the United States, which are owned
23  by several different legal entities within the Kimberly-Clark
24  family of legal entities, and Global Sales has the exact same
25  arrangement with them as it does with Kimberly-Clark Worldwide.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
844darqh                      Wesley - direct
```

1    Q.  That is the cost-plus arrangement?
2    A.  The toll manufacturing which is a cost-plus arrangement.
3              THE COURT:  Basically, the way Kimberly-Clark has this
4    structured it has one sales company; it has a number of
5    manufacturing facilities, which are under different corporate
6    umbrellas, all of those being part of the Kimberly-Clark family
7    of companies.
8              THE WITNESS:  That is correct.
9              THE COURT:  Got it.
10             By the way, is that toll, T-O-L-L?
11             THE WITNESS:  T-O-L-L, yes, a toll charge.
12             THE COURT:  Got it.
13   BY MR. COOPERMAN:
14   Q.  Mr. Wesley, this case, as you know, deals with diapers and
15   training pants.  Which manufacturers manufacture those
16   products?  We've already established that Worldwide is one of
17   them.  Are there others?
18   A.  Yes.  Again, in the U.S., because we obviously make thee
19   products around the world, but in the U.S. there are three
20   manufacturing facilities that make diapers and training pants.
21   I've already mentioned the Ogden, Utah facility, which is owned
22   by Kimberly-Clark Worldwide.  There are two other facilities.
23   One is located in Texas, in Paris, Texas, and the other is
24   located in Beach Island, South Carolina, and both of those
25   facilities are owned by Kimberly-Clark Corporation.

844darqh                          Wesley - direct
1    Q.  Sir, do you have a sense as to about what percentage of the
2    Huggies and training pants, the Pull-Ups, that are manufactured
3    come from Worldwide as opposed to the Kimberly-Clark
4    Corporation facilities?
5    A.  Yes, there are three facilities.  The production capacity
6    of each of them is slightly different, but roughly one-third of
7    our diapers manufactured in the U.S., and training pants as
8    well, would come from the Ogden, Utah facility, which is the
9    Kimberly-Clark Worldwide facility.
10   Q.  OK.  I want to go back to the chain that we spoke about.
11          I believe you said that after the products are
12   manufactured, they go to distribution centers, is that right?
13   A.  Yes, Kimberly-Clark Global Sales owns or operates
14   distribution facilities.  So as product comes off the end of
15   the production line, it gets boxed up and those boxes will go
16   to distribution centers.  Those centers may be located
17   physically adjacent to the manufacturing facility and so it
18   could be owned by the manufacturer, but the operators, the
19   people that work in those facilities, are Kimberly-Clark Global
20   Sales employees.
21          There are also a series of distribution centers that
22   are not affiliated with the actual facility itself, they will
23   be stand-alone, strategically located throughout the U.S. to
24   control cost, the costs of shipping, and those will be either
25   owned or leased by Kimberly-Clark Global Sales and operated

```
      844darqh                    Wesley - direct
 1   with Kimberly-Clark Global Sales' employees.
 2   Q.  So Global Sales interfaces with the customer, places an
 3   order with Worldwide, Worldwide manufactures for Global Sales,
 4   and then sends it to distribution centers usually for Global
 5   Sales and certainly operated by Global Sales; is that correct?
 6   A.  That's correct.  The same applies to the other
 7   manufacturing facilities.  So if you wanted to get product for
 8   a Kimberly-Clark facility, we do the same thing as you just
 9   described for the Worldwide facility.
10   Q.  So you do that, for example, for the Kimberly-Clark Corp.
11   facility?
12   A.  Yes.
13   Q.  So why in the world have you set up the company with this
14   structure, this toll manufacturing structure?
15   A.  Yes.  Toll manufacturing structures offer a number of
16   efficiencies in operations.  It allows us both from the actual
17   physical side of it as well as the recordkeeping of it, as you
18   could imagine, there is a lot going on and so our information
19   technology systems, which was a very important part of this
20   project, how do you pull this altogether, and we gain a lot of
21   efficiencies and it allows us to see deep into the
22   organization, to see the orders that you just described, the
23   inventory levels, and by doing it the way we have done it, we
24   get better efficiencies.  It also allows you to eliminate
25   duplicate roles for the various manufacturers and sellers so
```

```
        844darqh                    Wesley - direct
 1   there are some efficiencies there, and there were obviously
 2   some tax benefits, as well, from this structuring.
 3   Q.  Of the three facilities that you described that manufacture
 4   Huggies and manufacture Pull-Ups, you said that one of them is
 5   owned by Worldwide, correct?
 6   A.  Correct.
 7   Q.  Do any of the products that Worldwide makes, any of those
 8   Huggies or Pull-Ups, make their way to New York?
 9   A.  I would have to say I would expect that to be the case.
10   You know, there is, again, our manufacturing footprint, where
11   your put your facilities, you put your facilities in a way to
12   minimize your costs.  So in distribution trucking obviously is
13   a significant cost.  So most of the product I think that comes
14   out of the Ogden facility is going to be destined for West
15   Coast locations.  The product manufactured in Texas, sort of
16   the middle of the country.  The product manufactured in South
17   Carolina, the eastern side of the country.
18              That said, each facility doesn't make 100 percent of
19   all of the products.  In some cases it is more efficient to run
20   a product through a particular mill and not have the other
21   mills manufacture it.  So I would expect some volume of
22   products coming out of the Ogden mill -- Ogden, Utah mill --
23   will eventually end up on the East Coast
24   Q.  Just to clarify, the products -- of course, we are talking
25   now about diapers and training pants -- are those
```

844darqh                        Wesley - direct
1   Kimberly-Clark Worldwide products or are they Global Sales'
2   products or are they entities' products?
3   A.   They are Kimberly-Clark Global Sales' products, and
4   Kimberly-Clark Global Sales has arranged for them to be
5   manufactured using the intellectual property that it has
6   licensed from Kimberly-Clark Worldwide.
7   Q.   Does Kimberly-Clark Global Sales have the right to have
8   products manufactured by others besides Kimberly-Clark
9   entities?
10  A.   It does.  We would call those certified suppliers.
11  Q.   OK.  I want to go back to Kimberly-Clark Worldwide for a
12  moment.
13          You described the manufacturing services it provides,
14  the toll manufacturing, and we all know that it's also an IP
15  holding company.  So those are two functions it serves.
16          Are there any other functions that it serves in the
17  enterprise?
18  A.   It is also the entity within Kimberly-Clark wherein a very
19  high percentage of our foreign subsidiaries, their ultimate
20  ownership comes through that entity.  So if you looked at
21  Worldwide and said where does Worldwide get most of its money,
22  most of its money comes up through its foreign subsidiaries,
23  the earnings that they make from overseas.  Most of its money
24  is from overseas.
25  Q.   Let's turn to licensing in a little bit more detail.  Her
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
844darqh                    Wesley - direct
```

1    Honor asked some of those questions in her note to us.
2              Could you explain what licensing relationship exists
3    between Worldwide and Global Sales?
4    A.   Yes.   There is a license agreement that Kimberly-Clark
5    Global Sales has entered into with Kimberly-Clark Worldwide.
6    Worldwide owns the intellectual property, has licensed it to
7    Global Sales.   In exchange, Global Sales pays it a licensing
8    fee.
9              Just to complete the chain, with that license and the
10   right to have the products manufactured, Global Sales turns
11   around and enters into agreements, gives a license to
12   manufacturers so that they can use it, as well as have a supply
13   agreement with them so that they can manufacture products for
14   Kimberly-Clark Global Sales.
15   Q.   Before I forget, I want to backtrack for a second and just
16   clarify:  In terms of responsibilities, does Worldwide sell or
17   market any products?
18   A.   No, it does not.
19   Q.   OK.  So back to licensing.
20              Are the three patents in suit the only intellectual
21   property that Worldwide licenses to Global Sales?
22   A.   No.
23   Q.   So what has been licensed?
24   A.   Essentially all of the intellectual property that Global
25   Sales would need to be able to have manufactured and then sell

844darqh                    Wesley - direct
1    the products.  So, brand names, trademarks, know-how, and then
2    patents for products that are not in dispute, Kleenex and paper
3    towels and tissue products and medical products.  We have a
4    medical products division as well.
5    Q.  Do you have any approximation of how many patents, for
6    example, Worldwide has licensed to Global Sales?
7    A.  There is a very long list in the license agreement.  I
8    don't know the exact number but it numbers in the hundreds, if
9    not more.
10   Q.  Is it possible that number is in the thousands?
11   A.  It is very possible it is in the thousands.
12   Q.  Has Kimberly-Clark Worldwide licensed the patents in suit
13   to anyone besides Kimberly-Clark Global Sales?
14   A.  Yes, it would have had to license them to -- it would have
15   had to, and it did, license them to Kimberly-Clark Corporation
16   so Kimberly-Clark Corporation could manufacture diapers and
17   training pants.
18            It would have also manufactured -- it would have
19   licensed those patents to foreign operations, or the foreign
20   equivalent of those patents, where those products will be used
21   by Kimberly-Clark's facilities overseas.
22   Q.  Has Kimberly-Clark Worldwide licensed its patents or the
23   patents in suit to anyone who is unrelated to Kimberly-Clark, a
24   third party?
25   A.  Yes, I am aware of at least three of those, two of which
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

844darqh                       Wesley - direct

1   that license is to what you would call a private-label
2   manufacturer.  That is a company that would manufacture
3   products for a store, like Wal-Mart, as private label, others,
4   and grocery stores that have their own private label.  So there
5   is one company in Canada that has that license and uses it for
6   sales of products in North America, and there is a company in
7   Europe as well as Australia, the same company, that has a
8   license to private-label products in those jurisdictions.
9   Q.   Just to be clear to make sure I understand, Kimberly-Clark
10  Worldwide has licensed at least a couple of patents in suit to
11  non-Kimberly-Clark entities that then manufacture and sell
12  diapers and/or training pants into the United States?
13  A.   That's correct.
14  Q.   Could you identify those -- is the identification of those
15  companies, is that confidential?
16  A.   We don't normally disclose that.  I don't feel that is it
17  is necessary -- I am trying to make the point that who our
18  customers are and who has these licenses is not something that
19  we would normally publicly disclose.  We haven't done that, but
20  if it is important here, I don't feel that it is so secret that
21  I can't give you the names.
22           MR. COOPERMAN:  Would your Honor like to know that?
23           THE COURT:  The ultimate question is where I want to
24  know it.  I don't think I need to know it necessarily, but I
25  don't know what your clients think.  But let's move on.

```
    844darqh                    Wesley - direct
 1            MR. COOPERMAN:  OK.
 2  BY MR. COOPERMAN:
 3  Q.  Could you tell us what products Kimberly-Clark manufactured
 4  that use our incorporated patents that are involved in this
 5  lawsuit?
 6  A.  Kimberly-Clark Corporation or --
 7  Q.  Thank you.  At Kimberly-Clark Worldwide, what products are
 8  manufactured that are covered by the patent in suit?
 9  A.  Kimberly-Clark Worldwide at their Utah facility will make
10  diapers and training pants, and I understand that there are
11  three patents that are in issue in this case that relate to
12  diapers and training pants.
13  Q.  So that is Huggies and Pull-Ups, is that right?
14  A.  Yeah, those would be the brand names, correct, as well as
15  some private label that we do ourselves.
16  Q.  Are you aware if the license agreements with these third
17  parties -- let me back up -- are exclusive or nonexclusive?
18  A.  I know that the license agreements exist.  I per se have
19  not seen the license agreements, and I don't believe they are
20  exclusive since Kimberly-Clark itself was using them in other
21  jurisdictions as well.  But I'm not sure how to answer that
22  correctly.
23  Q.  You are not sure?
24  A.  I don't know.
25  Q.  What control does Kimberly-Clark Worldwide exert over
```

844darqh                    Wesley - direct
 1  Kimberly-Clark Global Sales in terms of its business operations
 2  or strategic goals?
 3  A.  Kimberly-Clark Worldwide is a licensor, and that's
 4  really -- its level of interest in what Kimberly-Clark Global
 5  Sales does is really limited to making sure that it is
 6  protecting the intellectual property that it owns, like any
 7  licensor would, and that is primarily done through quality
 8  control.  You want to make sure that the product that's being
 9  manufactured and distributed using your tradenames, trademarks,
10  brands, and the underlying features of the patented products is
11  being done according to specs and done appropriately.  So they
12  have rights to approve products, final products, how they come
13  off the production line, in that sense.  They don't control the
14  management of Global Sales.  They don't tell Global Sales where
15  to sell products, that sort of control.
16  Q.  So then the control you are talking about, the products'
17  quality control, is that sort of a trademark quality control
18  since the Kimberly-Clark Worldwide trademarks are appearing on
19  the Global Sales' product?
20  A.  Correct.
21          THE COURT:  It is real easy to control the quality if
22  you are the one who is doing the manufacturing.
23          THE WITNESS:  Well, they have -- that's easier when it
24  is Worldwide manufacturing, but there are other entities that
25  manufacture as well.  So they exert what is called a control

```
         844darqh                      Wesley - direct
 1   influence, if you will, on all manufacturers.
 2              THE COURT:  To the extent that it manufactures diapers
 3   that are sold in the United States, that's its method of
 4   exerting quality control?
 5              THE WITNESS:  Yes, I agree with that.
 6              THE COURT:  It controls the quality by doing it
 7   itself?
 8              THE WITNESS:  It is checking its own work.
 9              THE COURT:  It is a great way to protect your patent
10   and your trademark.
11   BY MR. COOPERMAN:
12   Q.  Does Worldwide have any say in who the executives are of
13   Global Sales?
14   A.  No.
15   Q.  About how many employees does Kimberly-Clark Worldwide
16   have?
17   A.  I don't know the exact number.  Its employees will consist
18   of the manufacturing employees at its three facilities as well
19   as employees who are focused on protecting the intellectual
20   property, like the intellectual VIP lawyers, as well as the
21   long-range research and development people.
22   Q.  Do any --
23   A.  But probably, I'm just -- I will throw out a number that I
24   think is roughly right but it could be off by 10/20 percent,
25   but I think that number is between 1,000 and 1200 employees.
```

```
      844darqh                    Wesley - direct
 1    Q.  About how many employees does Global Sales have?
 2    A.  I don't know that number either.  It is the sales force and
 3    quite a few other operations and it's significantly more.
 4    Q.  Significantly more than Worldwide?
 5    A.  Mm-hmm.
 6    Q.  Is that a yes?
 7    A.  I'm sorry, yes.
 8    Q.  How many employees -- or does Worldwide have any employees
 9    in New York?
10    A.  No.
11    Q.  Does Worldwide exert any control or any say over the
12    operational policies or marketing of the products it
13    manufactures for Global Sales?
14    A.  I'm sorry, could you say that again, please?
15    Q.  Sure.  Does Worldwide exert any control over the
16    operational policies or marketing of the products it
17    manufactures for Global Sales?
18    A.  Not directly.  Again, the only control they will have would
19    be to the extent it related to the quality control and
20    trademark protection.  So for an example, if Global Sales or
21    any -- if Global Sales wanted to use an advertising program
22    that was damaging to the brands, they wouldn't be able to do
23    that.
24    Q.  So, now, isn't it true that -- or does Kimberly-Clark
25    Worldwide receive some financial benefit from Global Sales
```

```
        844darqh                    Wesley - direct
 1  selling products into New York?
 2  A.   I think the answer is probably yes.
 3  Q.   In what way?
 4  A.   Two ways.  To the extent that a product is manufactured by
 5  Kimberly-Clark Worldwide in Utah and it finds its way into New
 6  York, Worldwide is compensated for the manufacturing of that
 7  product on a cost-plus basis, as I mentioned that earlier.
 8          The other way it would receive compensation is the
 9  license agreement that it, that Global Sales, has with
10  Kimberly-Clark Worldwide calls for Global Sales to pay a
11  licensing fee to Worldwide, and that licensing fee has varied
12  over time; it has been different at different times.  In 2007,
13  and really from 2003 until 2007, it was a flat fee.  So in that
14  sense there was no -- it didn't matter where the products were
15  sold, it was still going to be a flat fee.
16          We're currently working on a project where that's
17  going to be changed on a going-forward basis, starting with
18  2008.  That is going to be based on a formula that's called
19  residual profits methodology, very common in the transfer
20  pricing world, pretty complicated, and we are not done with our
21  formula.  We haven't figured it out completely yet.
22  Q.  So at the time this lawsuit was filed, which is December of
23  2007, then there was a flat-fee royalty, is that right, that
24  Global Sales paid to Worldwide for its intellectual property?
25  A.   That's correct.  So regardless of the sales volume or where
```

```
        844darqh                    Wesley - direct
 1   products were sold, there was still a flat fee.
 2   Q.  I want to go back to the financial benefit question again.
 3            Would it be true that any shareholder of
 4   Kimberly-Clark publicly available stock would receive some
 5   financial benefit based on sales of Kimberly-Clark products
 6   into New York?
 7   A.  Sure.
 8            THE COURT:  Wait.  I don't have my realtime up.
 9            What was that question?
10   BY MR. COOPERMAN:
11   Q.  The question was:  Would a shareholder of Kimberly-Clark
12   Corporation receive a financial benefit from sales of product
13   into New York by Kimberly-Clark Global Sales?
14   A.  I think the answer to that would be yes.  To the extent
15   that sales are made, profits are generated, a shareholder of
16   Kimberly-Clark Corporation benefits from them.
17            THE COURT:  Kimberly-Clark Corporation is the public
18   company, right?
19            THE WITNESS:  It is the ultimate parent entity, which
20   is a public company, correct, your Honor.
21   BY MR. COOPERMAN:
22   Q.  Can you give us a sense of about how much in its annual
23   revenues Worldwide gets from its manufacturing relationship
24   with Global Sales?
25   A.  I can't give you precise numbers.  I can tell you that it
```

844darqh                    Wesley - direct
1  is a relatively small number from Worldwide's perspective.
2  Most of what Worldwide will make, or where it gets its most
3  significant source of revenue, is from dividends and profits
4  that come from the foreign subsidiaries, all of which are
5  ultimately, or most of which are ultimately owned by that
6  entity, by Worldwide.
7  Q.  Do you have any sort of approximation in terms of
8  percentage of revenues that Worldwide makes from its
9  manufacturing relationship with Global Sales, approximately?
10 A.  Of Worldwide's income?
11 Q.  Yes, of Worldwide's income.
12 A.  I don't have that exact number.  I would roughly guess that
13 it is less than a quarter of its revenue, maybe even
14 significantly less than that.
15 Q.  Does Global Sales license intellectual property from other
16 companies for its diapers?
17 A.  I believe that it does.  I believe it needs to license
18 technology from other people.  Not all the technology that we
19 use is owned by Kimberly-Clark.
20 Q.  What about trademarks and copyrights and things like that,
21 does it sometimes license intellectual property in designs that
22 go on diapers, for example?
23 A.  Sure.  A common example is licensing from a company like
24 Disney or Pixar where you would put it on your diaper or your
25 product a design to make it more enticing to the consumer to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
      844darqh                    Wesley - direct
 1    buy.
 2    Q.  And would these third parties who are unrelated to K-C but
 3    have this trademark licensing relationship also exert quality
 4    control over the products that K-C Global Sales is selling?
 5    A.  Yes, global products.
 6              MR. COOPERMAN:  Can I have a moment, your Honor,
 7    please?
 8              THE COURT:  Sure.
 9              (Pause)
10              MR. COOPERMAN:  Nothing further, your Honor.
11              THE COURT:  OK.  This is what I am going to do.  I've
12    got some folks who actually, God bless you, want to put a
13    settlement on the record to take a case off my trial calendar.
14    I need to deal with them now.  They have been here since 10
15    o'clock this morning.  They actually got in through the
16    magnetometers early.  I would like to deal with them now and
17    get them off.
18              Can you guys go to lunch and come back at about 10 of
19    2?
20              MR. COOPERMAN:  Certainly.
21              THE COURT:  Thank you very much.
22              Sorry, sir.
23              THE WITNESS:  That is all right.  Thank you.
24              (Luncheon recess)
25
```

```
844darqh                    Wesley - cross
 1                A F T E R N O O N   S E S S I O N
 2                             2 p.m.
 3            THE CLERK:  Hearing continuing in 07 Civil 11202.
 4            THE COURT:  OK.  Mr. Wesley, would you mind resuming
 5   that seat.  Thank you, sir.
 6            THE WITNESS:  Sure.
 7   JOHN W. WESLEY,
 8        Resumed, and testified further as follows:
 9            THE COURT:  All right.  Do we have some
10   cross-examination here?
11            MR. SIFF:  Yes, your Honor.
12            Your Honor, if I could approach the witness now just
13   to provide him with just some things that I might be asking him
14   about?
15            THE COURT:  Sure.
16            MR. SIFF:  Thank you.
17   CROSS-EXAMINATION
18   BY MR. SIFF:
19   Q.  Good afternoon, Mr. Wesley.  How are you?
20   A.  I'm fine.  Thank you.
21   Q.  Good.  I've put in front of you a couple of bags there.  Do
22   you recognize those bags?
23   A.  Sure.
24   Q.  And those would be?
25   A.  There is a package of Huggies Pull-Ups and a package of
```

```
844darqh                    Wesley - cross
```

 1    Huggies Supreme Natural Fit Diapers.
 2    Q.   Do both of those bags have on them the famous Huggies
 3    trademark?
 4    A.   Yes.
 5    Q.   And are those diapers and training pants sold in New York?
 6    A.   I would assume that they are, yes.
 7    Q.   And with respect to the trademarks, is there goodwill
 8    associated with the sale of those brands of diapers and
 9    training pants?
10    A.   There is goodwill associated with trademarks.
11    Q.   And that goodwill reverts back to the owner of the
12    trademarks, is that correct?
13    A.   That is correct.
14    Q.   And Kimberly-Clark Worldwide is the owner of the
15    trademarks?
16    A.   That is correct.
17    Q.   And, therefore, Kimberly-Clark Worldwide, as owner of the
18    trademarks, reaps the benefits of the sale of those products in
19    New York?
20    A.   In what way?
21    Q.   Well, you mentioned that there was goodwill associated with
22    the sale of those products that have that trademark on them, is
23    that correct?
24    A.   That's correct.
25    Q.   And that goodwill reverts back to Kimberly-Clark Worldwide,

844darqh                    Wesley - cross

1  and that goodwill also goes to increasing the value of the
2  trademark, Huggies, is that correct?
3  A.  I'm not a valuation expert.  I would assume that that is
4  the answer but that is beyond my personal knowledge.
5  Q.  Do you know what the value of the Huggies' mark is?
6  A.  It's considerable, billions of dollars.
7  Q.  Billions of dollars.
8          And part of that billions of dollars is due to sales
9  of the Huggies brand diapers and training pants in New York?
10  A.  I would assume that to be the case, yes.
11  Q.  And in the end is it important to Kimberly-Clark Worldwide
12  that these products are sold in New York?
13  A.  Kimberly-Clark Worldwide, as the owner of the intellectual
14  property, has licensed it.  So, yes, as a licensor of
15  intellectual property, it would hope that that product is sold
16  everywhere.
17  Q.  Everywhere, and New York included, correct?
18  A.  New York included.
19  Q.  And it is important to Kimberly-Clark Worldwide that those
20  products are sold in New York, correct?
21  A.  I don't parse words with you.  It is important for
22  Kimberly-Clark and the products we sold.  If the products are
23  sold outside of New York, that's fine.  I have got no --
24          THE COURT:  In other words, as far as Worldwide is
25  concerned, the more places it sold, the better?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

844darqh                        Wesley - cross
 1                THE WITNESS:  Without a question.
 2                Then we would like --
 3                THE COURT:  Anywhere and everywhere would be fine?
 4                THE WITNESS:  And Worldwide would definitely like to
 5     see its products sold in New York and every other state and in
 6     every other country.
 7     BY MR. SIFF:
 8     Q.  Is there copyrightable material on those bags that helps
 9     sell those products?
10     A.  Copyrightable, yes.
11     Q.  Are there pictures on there and graphics and artwork and
12     things of that nature?
13     A.  There certainly is.
14     Q.  Do you know who the owner of that copyrightable material
15     is?
16     A.  Some of it I'm assuming is off -- well, again, I'm not an
17     expert, I don't know everything that's on here.
18                There are certainly marks from Disney.  Disney
19     obviously is going to have its own rights on those.  We would
20     have licensed those from Disney.  But the other materials are
21     going to be owned by Kimberly-Clark Worldwide.
22     Q.  I think if you turn the package to at least one side of
23     there, I believe it will tell you that Kimberly-Clark Worldwide
24     owns copyrights regarding what is shown on the packaging; is
25     that correct?

844darqh                          Wesley - cross
1            I believe it is on one of the shorter sides, as
2    opposed to the bases.  The pink box, it would be on the bottom.
3    Is it in there?
4            (Pause)
5            It is in small print.
6            THE COURT:  Why don't you show him what you are
7    talking about.
8            THE WITNESS:  I have the location.  I am just trying
9    to read it.
10   A.  The package will show that there is copyrights, a C in a
11   circle, the copyright symbol, and that it is owned by
12   Kimberly-Clark Worldwide or "KCWW," as it says here.
13   Q.  Thank you.  And just so the record is clear, that would be
14   the same for the other bag, which is the diapers?
15   A.  I see it says, "Distributed by Global Sales."
16           (Pause)
17           MR. SIFF:  Your Honor, if it would help --
18   A.  The same mark, Kimberly-Clark Worldwide, KCWW.
19           Right below it is the mark for Disney, showing that
20   they have a copyright in the name of Winnie The Pooh.
21   Q.  Other than that, the copyrights are for Kimberly-Clark
22   Worldwide, correct?
23   A.  That's what it says.
24   Q.  And those copyrights or that copyrightable material helps
25   sell those products, correct?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
       844darqh                    Wesley - cross
```
1   A.  That is correct.
2   Q.  Next to you I have also placed a copy of each of the
3   patents in suit in this case?
4           MR. SIFF:  Your Honor, if it would help, I could read
5   those numbers into the record or if it is necessary I will just
6   move on.
7           THE COURT:  It is not necessary.
8   BY MR. SIFF:
9   Q.  Are you familiar with those patents?
10  A.  No, I'm not.  I'm not personally familiar with the patents.
11  I never read the patents before.  I've never seen the patents
12  before.
13  Q.  Are you aware of whether or not let's start with diapers
14  are covered by any or all of those patents?
15  A.  I have been told that they do.
16  Q.  I'm sorry?
17  A.  I have been told that the patents, these patents, which you
18  are representing that these patents are the patents that are at
19  issue --
20  Q.  Yes.
21  A.  -- and I have been told, in getting ready for this
22  discussion today, that these patents at issue go to the
23  processes and features of diapers and training pants.
24  Q.  And just so it's clear, when you refer to "those patents,"
25  you are referring to all three of those patents that are in

```
844darqh                     Wesley - cross
```

1  this lawsuit?
2  A.  Again, my discussions have not -- well, it didn't say -- I
3  don't know, for example, that all three patents apply to both
4  products.
5           THE COURT:  I don't think it is disputed.
6           THE WITNESS:  I believe that the three patents --
7           THE COURT:  Is it disputed?
8           MR. COOPERMAN:  There is no dispute about that, your
9  Honor.
10          THE WITNESS:  I just don't know.
11          THE COURT:  You don't know but the lawyer knows them.
12          MR. SIFF:  The same would be true -- I would assume,
13 your Honor, there is no dispute that those patents cover the
14 training pants, as well.  I don't mean to parse training pants
15 and diapers.  I just want to make sure that that is correct.
16          MR. COOPERMAN:  I have been advised that it is our
17 position not all three cover but at least some of them do.
18          THE COURT:  Fine.  Is there any dispute that the four
19 E patents cover processes or features that are incorporated
20 into Huggies' products, either diapers or training pants or
21 both.
22          MR. COOPERMAN:  There is no dispute about that, your
23 Honor.
24          THE COURT:  Fine.  I didn't think so.
25 BY MR. SIFF:

844darqh                        Wesley - cross
```
 1   Q.  Mr. Wesley, when the patented products, training pants and
 2   diapers, are sold in New York, is Kimberly-Clark Worldwide
 3   exploiting its patents?
 4   A.  I don't know how to answer that question.  I could tell you
 5   how it works.  Whether it is exploiting or not exploiting, I
 6   don't know what that word means.
 7   Q.  Well, do the sale of training pants and diapers put
 8   Worldwide in a position to ask for royalties for those patents?
 9   A.  Yes, and it does -- and it gets royalties.
10   Q.  So in fact --
11   A.  It gets a licensing fee.
12   Q.  And in fact it gets a licensing fee.
13           And who does that licensing fee come from?
14   A.  Kimberly-Clark Global sales.
15   Q.  So the sales of the diapers then, at least in the context
16   of the question I asked, the sale of the diapers and training
17   pants does exploit the patents in the sense that Kimberly-Clark
18   Worldwide does receive money for those patents?
19   A.  Kimberly-Clark Worldwide receives a licensing fee from
20   Global Sales.  Now, I'm not trying to parse words.  I don't
21   know what the word "exploit" means.  I have no idea of whether
22   the word exploit has legal significance at all.
23           THE COURT:  It is OK.  I understand your answer.
24           Your answer is that Worldwide licenses the patents, it
25   gets a fee for that, and until now or recently, a flat fee, not
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
      844darqh                    Wesley - cross
 1    contingent on the amount of sales.
 2             THE WITNESS:  Correct.
 3             THE COURT:  But that is about to change?
 4             THE WITNESS:  Right.
 5             THE COURT:  If you guys can work out the formula.
 6             THE WITNESS:  Correct.
 7             THE COURT:  OK.
 8    BY MR. SIFF:
 9    Q.  Are there other products that Kimberly-Clark Global Sales
10    sells in New York on behalf of Kimberly-Clark Worldwide?
11    A.  I assume the answer is yes.  Well, let me back up a second.
12             It doesn't sell on behalf of K-C Worldwide.  It sells
13    on behalf of itself.  It is the entity, the sale, the
14    customer-facing entity that actually sells our products.
15             Now, there are other products that Kimberly-Clark
16    Global Sales will sell in New York that use intellectual
17    property that is obtained from K-C Worldwide.
18    Q.  What products are those?
19    A.  Kimberly-Clark Worldwide owns all of the products, all of
20    the intellectual property for all of Kimberly-Clark's various
21    products and Global Sales sells all of those products.  So it
22    is tissue, like Kleenex.  It's toilet paper.  It's paper
23    toweling.  It's medical products.
24    Q.  And with respect to -- and the paper towels are Scott
25    towels?
```

```
     844darqh                    Wesley - cross
 1   A.  Scott?
 2   Q.  Yes.
 3   A.  Primarily Scott.
 4   Q.  So with respect to Kleenex and Scott towels, is there
 5   goodwill associated with the sale of those products?
 6   A.  Again, I'm not trying to parse words with you.  I know
 7   enough to know that goodwill is a legal concept, and I don't
 8   know what it means beyond that.  So you are asking me to
 9   confirm for you that a legal issue, goodwill, is attached to
10   any of these sales.  I just don't know that.
11           I can make some assumptions, as anybody would.
12           THE COURT:  You don't have to make any assumptions.
13   If any assumptions have to be made, I will make the
14   assumptions.
15   Q.  Let me put it to you simple:  Does the sale of Kleenex and
16   Scott towels increase the value of those trademarks?
17   A.  I'm not going to assume.  With the judge's instruction, I
18   don't know how the valuation of a trademark works so...
19   Q.  Do you have any idea of how much the Kleenex, the value of
20   the Kleenex mark is?
21   A.  It is also a billion-dollar brand.
22   Q.  How about the Scott trademark?
23   A.  It is a billion-dollar brand.  That means a billion dollars
24   of sales.  The brands are worth certainly more than that.
25   Q.  Does Global Sales sell those products in New York?
```

```
       844darqh                    Wesley - cross
 1  A.  Yes, it does.
 2  Q.  Who is the owner of those trademarks, Kleenex and Scott
 3  towels?
 4  A.  Kimberly-Clark Worldwide.
 5  Q.  If Global Sales did not exist, would Worldwide --
 6  Kimberly-Clark Worldwide stop selling diapers in New York?
 7  A.  No -- I'm sorry, say that again.
 8  Q.  Sure.  If Kimberly-Clark Global Sales did not exist, would
 9  Kimberly-Clark Worldwide stop selling diapers in New York?
10  A.  Well, it doesn't sell diapers in New York.  So I'll say
11  definitely if Kimberly-Clark Global Sales were to go away,
12  would there be some other entity out there that might sell the
13  products?  The answer to that would be yes.  Could it be
14  Worldwide?  Yeah, it could be Worldwide.  Could it be another
15  Kimberly-Clark entity?  Yeah, it could.  We chose to structure
16  it differently.
17          THE COURT:  I think his question probably is a little
18  bit different.
19          Would Worldwide stop dealing in diapers and
20  diaper-related trademarks and patents if Global Sales were to
21  disappear?  Would we no longer see Huggies in the world if
22  Global Sales were to disappear?
23          THE WITNESS:  No.  Obviously, the answer is that we
24  would find a way to sell the product.  Kimberly-Clark
25  Corporation or the enterprise would find a way to sell the
```

```
     844darqh                    Wesley - cross
 1   product if this legal entity didn't exist.
 2              MR. SIFF:  Thank you.
 3   BY MR. SIFF:
 4   Q.  Under the license agreement, does Kimberly-Clark Global
 5   Sales have the right to enforce Kimberly-Clark Worldwide's
 6   patents?
 7   A.  Yes, it does.  The right would go first to K-C Worldwide,
 8   and if K-C Worldwide chose not to enforce the right, then K-C
 9   Global Sales would have that right.
10   Q.  Is there a situation where Worldwide and Global Sales would
11   sue together, meaning bring the suit together?
12              THE COURT:  If you lift up that microphone just a
13   little bit.  I think it is at an angle for you, for a slightly
14   shorter person.
15   A.  I think the answer to that is yes.  I understand there is a
16   proceeding in Texas where both parties are the plaintiff.
17   Q.  Is Kimberly-Clark Global Sales licensed to do business in
18   New York?
19   A.  Yes, Kimberly-Clark Global Sales is the entity that does
20   business in New York.
21              MR. SIFF:  No further questions, your Honor.
22              MR. COOPERMAN:  Your Honor, may I do just a brief
23   redirect, please?
24              THE COURT:  Absolutely.
25              MR. COOPERMAN:  Thank you.
```

```
      844darqh                    Wesley - cross
 1    REDIRECT EXAMINATION
 2    BY MR. COOPERMAN:
 3    Q.  Just a few questions, Mr. Wesley.
 4             I believe at some point, under questioning by
 5    Mr. Siff, you testified that Worldwide would like to see its
 6    products sold everywhere.  I just want to go back and clarify.
 7             What products does Worldwide have, Worldwide have, if
 8    any?
 9    A.  Worldwide doesn't have products; Worldwide has intellectual
10    property.  So we would like -- Worldwide would like to see
11    products sold by somebody that bears its intellectual property.
12    Q.  You also said that K-C Corp. would find a way to sell
13    products if K-C World sales didn't exist.  I think you said
14    something like that.  Does that sound right?
15    A.  That is correct, yes.
16    Q.  Is K-C Worldwide situated to sell and market products at
17    this point?
18    A.  No, it has no sales force.  It has no connections to the
19    customers.
20    Q.  So it couldn't just immediately take up the slack?
21    A.  No, it could not.
22    Q.  I believe you also testified that K-C Global Sales could
23    sue under the patent if K-C Worldwide didn't sue.
24             Are you sure that you don't need to have the patent
25    owner involved in the lawsuit in order to bring suit under a
```

```
844darqh                    Wesley - redirect
```

1   patent?
2   A.  I have not gone back to read the license agreement, but my
3   recollection was that it had the ability for the patent owner
4   to bring claims, and if the patent owner chose not to, then the
5   licensee could step in and defend the action or to assert an
6   infringement action.
7          Again, I did not go back to reread that before I came
8   here today.
9   Q.  OK.  So you're not positive about the terms of the
10  agreement?
11  A.  That is correct.
12  Q.  Or how the law works with regard to requiring patent owners
13  to be parties to a lawsuit?
14  A.  I would have no idea of what the law says in this area.
15  Q.  And then just to wrap up, could you give us a summary of
16  how the K-C Global Sales, K-C Worldwide and K-C Corporation
17  structure exists?  Could you give us a sense for what each is
18  responsible for doing in the conglomerate?
19  A.  Yes, I could try.
20         Just the ownership structure starts with
21  Kimberly-Clark Corporation as the ultimate parent entity.  It
22  has two subsidiaries -- it actually has hundreds, but the two
23  that are relevant for this are Kimberly-Clark Worldwide and
24  Kimberly-Clark Global Sales, and Global Sales is the entity
25  that has been structured and set up so that it is the entity

844darqh                         Wesley - redirect
1   that makes all of the sales of products in the U.S.  So every
2   product that Kimberly-Clark sells in the U.S. is sold by K-C
3   Global Sales.  That is what it says on these packages as well,
4   that they are distributed by them.
5   Q.  Does K-C Corp. do any sales?
6   A.  It does not.
7            So K-C Worldwide has the three manufacturing
8   facilities that I testified to before and K-C Corporation has
9   17 or so manufacturing facilities, and those manufacturing
10  facilities all manufacture product on behalf of -- at the
11  request of Global Sales so that Global Sales can sell that
12  product in the marketplace.
13  Q.  And do these entities give each other instructions as far
14  as how to run their operations?  Does KCC, for example,
15  instruct K-C Global Sales as to how to run its operations, or
16  is it independently run?
17  A.  It is -- then there is coordination, as you would expect,
18  between manufacturers, sellers.  Who gives instructions, I'm
19  not sure how to answer that.  But there certainly is -- it is a
20  well-oiled machine.  It is a very coordinated process.
21  Q.  Does K-C Worldwide, for example, give direction to K-C
22  Global Sales as to its business strategies or the markets it
23  should be seeking or the customers it should be selling to?
24  A.  No, it does not direct the sales force or the marketing
25  efforts.  That's done by Kimberly-Clark Global Sales.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
        844darqh                    Wesley - redirect
 1   Q.  Are there separate boards for each of these corporations?
 2   A.  Each is a separate legal entity.  Each has a board of
 3   directors and officers, as required by law.
 4                MR. COOPERMAN:  I have nothing else, your Honor.
 5                (Pause)
 6                THE COURT:  OK.  Thank you so much, Mr. Wesley.
 7                THE WITNESS:  Thank you.
 8                (Witness excused)
 9                THE COURT:  You've brought another witness also?
10                MR. COOPERMAN:  Yes, we have.  Ms. Margolis is here.
11   I --
12                THE COURT:  You may have covered everything with
13   Ms. Margolis, but your client actually may have some questions
14   about the licensing and such that Mr. Wesley wasn't able to
15   answer.  I'm glad to hear from Ms. Margolis.
16                MR. COOPERMAN:  Could we have one minute to decide
17   whether we need to put Ms. Margolis on?
18                THE COURT:  Sure.
19                MR. COOPERMAN:  Thank you very much.
20                (Pause)
21                MR. COOPERMAN:  We have no direct for Ms. Margolis.
22                THE COURT:  Do you have any cross for Ms. Margolis?
23                MR. SIFF:  No, your Honor, we are fine.  Thank you,
24   your Honor.
25                THE COURT:  Well, too bad, Ms. Margolis, nobody wants
```

45

844darqh
1    to talk to you.
2              MS. MARGOLIS:  I'm sure there will be other
3    opportunities, your Honor.
4              THE COURT:  OK.  So that does flesh out the record in
5    an appreciable way, and I thank you, both of you, for coming
6    today on short notice.  I genuinely appreciate it.
7              And the whole thing is kind of an intriguing
8    proposition.  So what I would suggest is that now that we've
9    gotten the relevant facts on the table, that, you know, each of
10   you take ten days to put in your view on how it does or does
11   not support the exercise of the personal jurisdiction over
12   Worldwide, and that will resolve that question.  And if I think
13   I have jurisdiction, I am going to keep the case, and if I
14   don't think I have jurisdiction, it is going to Texas.
15             That's the easy answer.  OK?  All right?
16             MR. SIFF:  Very good, your Honor.
17             THE COURT:  Very interesting.  Very interesting.
18             Thank you.
19             ALL COUNSEL:  Thank you, your Honor.
20                                -  -  -
21
22
23
24
25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

46

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                            Page
 3    JOHN W. WESLEY
 4   Direct By Mr. Cooperman  . . . . . . . . .   8
 5   Cross By Mr. Siff  . . . . . . . . . . .    29
 6   Redirect By Mr. Cooperman  . . . . . . . .  41
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of April, 2008, a true and correct copy

of  the *Supplemental Memorandum in Support of Kimberly-Clark Worldwide's Motion to*

*Dismiss for Lack of Personal Jurisdiction* with accompanying exhibit served by

electronic mail, on:

      Brian Douglas Siff, Esq. (siffb@dicksteinshapiro.com)
      Richard LaCava, Esq. (lacavar@dicksteinshapiro.com)
      Peter Lambrianakos, Esq. (lambrianakosp@dicksteinshapiro.com)


          s/Gregory W. Gilliam
           Gregory W. Gilliam