Brian D. Siff (BS 6135)
Richard LaCava (RL 1671)
Peter Lambrianakos (PL 5075)
DICKSTEIN SHAPIRO LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 277-6500
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARQUEST, INC., Plaintiff, v. KIMBERLY-CLARK WORLDWIDE, INC., Defendant. | Civ. Action No.: 01-CV-11202 (CM)<br>ECF Case<br>Jury Demanded |

**DECLARATION OF BRIAN D. SIFF IN FURTHER OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION TO TRANSFER**

I, Brian D. Siff, Esq., hereby declare as follows:

1. I am an attorney-at-law duly admitted to practice before this Court, and a partner in the law firm of Dickstein Shapiro LLP, attorneys for plaintiff, Arquest, Inc. ("Arquest"). I submit this declaration in further opposition to the motion of defendant, Kimberly-Clark Worldwide, Inc. ("KCWW") to dismiss or, in the alternative, to transfer this case. I have personal knowledge of the matters set forth in this declaration.

2. A true and correct copy of the transcript of the April 4, 2008 hearing on this motion, including the testimony of John Wesley, a witness presented by KCWW, is attached hereto as **Exhibit A**.

3. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on this 18th day of April, 2008.

Brian D. Siff

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARQUEST, INC.,

Plaintiff, New York, N.Y.

v. 07 Civ. 11202 (CM)

KIMBERLY-CLARK WORLDWIDE, INC.,

Defendant.

------------------------------x

April 4, 2008
11:55 a.m.

Before:

HON. COLLEEN MCMAHON,

District Judge

APPEARANCES

DICKSTEIN SHAPIRO LLP
Attorneys for Plaintiff
BY: BRIAN D. SIFF
RICHARD LaCAVA
PETER LAMBRIANAKOS

BANNER & WITCOFF, LTD
Attorneys for Defendant
BY: MARC S. COOPERMAN
JANICE V. MITRIUS

VENABLE LLP
Attorneys for Defendant
BY: MATTHEW T. McLAUGHLIN

THE COURT: OK. Appearances, please.

MR. SIFF: Brian Siff, from Dickstein Shapiro, representing the plaintiff, Arquest, Inc., your Honor.

MR. LaCAVA: Richard LaCava, from Dickstein Shapiro, representing the plaintiff, Arquest, Inc.

MR. LAMBRIANAKOS: Peter Lambrianakos, also from Dickstein Shapiro, on behalf of Arquest.

MR. McLAUGHLIN: Good morning, your Honor. Matthew McLaughlin, from Venable, for Kimberly-Clark Worldwide.

MR. COOPERMAN: Good morning, your Honor. Marc Cooperman, from Banner & Witcoff, for Kimberly-Clark Worldwide.

MS. MITRIUS: Janice Mitrius, from Banner & Witcoff, on behalf of Kimberly-Clark Worldwide, your Honor.

THE COURT: OK. Everybody, have a seat.

This case was originally on for an initial conference, and it is my habit to dispose of motions to dismiss or transfer at initial conferences, and I had such a motion and it was fully briefed and we have been going through the papers. And as you know, because I sent you out a little note, there is an awful lot missing from the movant's papers relating to the motion to dismiss for lack of personal jurisdiction.

I confess, as an old user of many Kimberly-Clark products for I think the entirety of my life, I was surprised to get the motion. The moving affidavits are a lot more interesting for what they don't say than for what they do say,

and we need to get such matters cleared up before we can act on that motion.

But I was particularly disturbed this week to receive copies of briefs that had been filed in front of one of my comrades down in Texas where someone, who never spoke to me, opined that I was going to transfer this case to Texas.

If I have personal jurisdiction, I'm not transferring this case to Texas. All right? Let me make that very clear from the get-go, from the outset. I love patent cases. I enjoy patent cases. I have fun with patent cases. And I am happy to keep patent cases. I am not allergic to patent cases. I'm getting a patent case decision out today.

So we need to resolve the issue of personal jurisdiction if in fact it is still on the table.

Is it still on the table?

MR. COOPERMAN: It is, your Honor.

THE COURT: Then, Mr. McLaughlin, you have a lot of questions to answer.

MR. McLAUGHLIN: Your Honor, I'm sorry. I'm Mr. McLaughlin. I'm local counsel.

THE COURT: I'm so sorry.

MR. COOPERMAN: I had moved for Mr. Cooperman's pro hac admission, your Honor, and it has been granted. May he address the Court directly?

THE COURT: He absolutely can.

MR. COOPERMAN: Thank you, your Honor.

First, I want to apologize on behalf of Kimberly-Clark Worldwide and Kimberly-Clark Global sales. It was presumptuous of us to tell the district court in Texas how we thought you would rule.

At the time we filed our opposition in Texas, we thought we were being balanced. We didn't ask the Texas court to rule on the motion to dismiss and get the case going. We said, no, this is an issue for the judge in New York and you should wait for the judge in New York to rule. Her ruling will control. So we felt that we were getting downtown. But in retrospect, we should have --

THE COURT: Look, guys, enough of these reasons, let's move on to the merits.

MR. COOPERMAN: Your Honor, we have brought up an officer from Kimberly-Clark Worldwide, whose name is John Wesley -- he is assistant secretary of Kimberly-Clark Worldwide -- to address those questions that you have raised in your note that you sent to us. So he is here prepared today to testify however you want.

THE COURT: Great.

MR. COOPERMAN: In addition, we have Vicki Margolis. You may know her name. She is one of our declarants. She is in-house counsel, in-house patent litigation counsel for Kimberly-Clark. She joined us from Neenah, and Mr. Wesley has

flown up from Dallas to be here today.

We also have, if necessary, Mr. Misun, whose declaration you mention in your note. He is not here today because you said you didn't want him here

THE COURT: Correct.

MR. COOPERMAN: But he is available by phone if we need to ask him any questions, as well.

THE COURT: OK. Fine.

Well, let's hear from someone. You know what I'm interested in.

That moving affidavit has an awful lot of holes in it, and if you want to convince me that I lack personal jurisdiction over the holder of the patents for the diaper that is in danger of becoming oblivious, its trademark, because everybody calls all disposable diapers Huggies, then you've got a lot of questions to answer.

MR. COOPERMAN: I understand, I think, where your Honor's concerns are at.

We are dealing with two entities here -- Kimberly-Clark Worldwide, who is the named defendant, who is the owner of the intellectual property, and Kimberly-Clark Global Sales. Mr. Misun's declaration, which your Honor has pointed out was deficient, only goes to half of the story, absolutely focuses on Kimberly-Clark Worldwide. We viewed that as the central issue.

In our reply brief --

THE COURT: No, it left a whole lot of issues open about Kimberly-Clark Worldwide. Kimberly-Clark Worldwide owns these patents. The patents, unless we are going to use them to paper the executive washroom, the patents are of no value to Kimberly-Clark Worldwide unless they are being exploited. I would be shocked to learn that it was not the business of Kimberly-Clark Worldwide to get those patents out there.

And according to your papers, this is not just a holding company for intellectual property, this is a company that manufactures something. And if I were a betting person, I would be betting that they manufacture diapers and that they manufacture diapers that incorporate the patented features and use the patented process that are in your patent.

Am I right so far?

MR. COOPERMAN: You are correct, your Honor.

THE COURT: Well, isn't that amazing.

Now, so the exploitation of the patents is obviously done by getting those diapers out there in the marketplace, and we all know that diapers, Huggies, are sold everywhere in the known universe because it is the goal of Kimberly-Clark, the conglomerate, to get every little baby's bottom covered in a Huggie, as opposed to any other kind of diaper, right?

MR. COOPERMAN: As an enterprise, I would agree with that. Of course, there are different entities and that's

part --

THE COURT: Sure there are different entities involved, but if Kimberly-Clark Worldwide, which owns the patent, manufacturers the diapers that get sold in the State of New York, as part of its business activity manufactures those diapers, I just don't see how you can say it's not doing business in New York, if only through the good offices of its sister corporation -- am I correct? Sister corporation?

MR. COOPERMAN: Kimberly-Clark Global Sales a sister corporation, that is correct.

THE COURT: Right. If only for the good offices of its sister corporation, which I'll bet owns, in a technical sense, the cotton and the plastic and the stuff that's used to manufacture the diapers, and then sells the diapers, right?

MR. COOPERMAN: It does that and it also does more, your Honor.

THE COURT: Oh, good. OK.

Well, I'm happy to hear anything that you all want to tell me about this. But those facts are relevant facts and they are conspicuously absent from your moving papers, which is why I said that the moving papers appeared as they were trying to be deliberately obfuscatory. I think I was right about that.

MR. COOPERMAN: I disagree, your Honor, that we were trying to be deliberately obfuscatory --

THE COURT: Then you were accidentally obfuscatory.

MR. COOPERMAN: We thought we were addressing the central issue, and we will certainly address Kimberly-Clark Global Sales and the relationship with Worldwide in our reply brief.

THE COURT: Let's hear from the folks that you've brought up here, OK?

MR. COOPERMAN: Certainly. Would you like us to put them on the stand?

THE COURT: That would be just great.

What is your name, sir

THE WITNESS: John Wesley.

THE COURT: Mr. Wesley, good morning or good afternoon. Won't you take a seat.

JOHN W. WESLEY,

called as a witness by the defendant,

having been duly sworn, testified as follows:

THE CLERK: Please state and spell your name for the record.

THE WITNESS: My name is John Wesley, J-O-H-N W-E-S-L-E-Y.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. COOPERMAN:

Q. Mr. Wesley, would you please tell the Court what your

position is and why we brought you as a representative of Kimberly-Clark Worldwide?

A. Yes. I am an officer of both Kimberly-Clark Worldwide and Kimberly-Clark Global Sales. I am the assistant secretary for both entities.

Q. And have you had any responsibility in restructuring of the organization?

A. Yes. I'm also the chief counsel of corporate transactions for Kimberly-Clark Corporation, and in that role I worked on a project where we restructured our operations in the U.S., including the way in which we license our technology and manufacture products.

Q. Would you tell the Court, please, what products precisely does Kimberly-Clark Worldwide manufacture?

A. Kimberly-Clark Worldwide has three manufacturing facilities, all of which are located in the western United States. There is one in Fullerton, California, a suburb of Los Angeles, and that facility manufactures tissue products, I think Kleenex.

THE COURT: Kleenex, my favorite Kimberly-Clark product.

THE WITNESS: We appreciate that.

THE COURT: Love it. Love it. Couldn't live without it.

Q. Does that manufacture any diapers or training pants?

A. No, no diapers or training pants at that facility. We call that a tissue mill.

Q. What other facilities?

A. We have a facility in Everett, Washington and in that facility they make paper towels and paper napkins, like Scott towels.

Q. Any other facility?

A. And there is one -- there is a third facility and that facility is located in Ogden, Utah, a suburb of Salt Lake, near Salt Lake.

Q. And what is manufactured --

A. That facility is a diaper facility. It manufactures diapers and training pants.

Q. So there are three facilities and the only one that manufactures diapers and training pants is Ogden, Utah, is that correct?

A. That is correct.

Q. Who does K-C Worldwide manufacture for? Who are K-C Worldwide's customers?

A. K-C Worldwide manufactures all of its products at the request of Kimberly-Clark Global Sales. Theres a supply agreement pursuant to which Global Sales purchases all of the raw materials that are used in the manufacturing process, delivers those to the manufacturer, which was the three facilities I just described, and then sells those products, the

finished goods inventory. Worldwide sells the finished goods inventory or delivers it to Global Sales.

Q. Could you briefly walk us through --

THE COURT: Again, I just want to -- Global Sales purchases the raw materials and delivers them to Worldwide in Ogden, Utah, which manufactures the diapers and then sells the diapers back to Global Sales?

THE WITNESS: I misspoke when I said "sells them." They are owned by Kimberly-Clark Global Sales from the very beginning.

THE COURT: That's what I wanted to clarify.

THE WITNESS: The way you would think of this manufacturing process, and it is not unique to Kimberly-Clark, it is called toll manufacturing. So the entity that is selling the goods, in this case K-C Global Sales, has contracted with manufacturers to make products for it, and it has contracted with K-C Worldwide to make its products, both the tissue and everything else, as well as the diapers, out of Ogden. And for that K-C Worldwide is compensated by Kimberly-Clark Global Sales on a cost-plus basis, which is, again, fairly common for coat packers or contract manufacturers or other companies that have toll manufacturing structures.

Q. So can you walk us through how an order would originate with the customer and how that order would then be passed along through the Global Sales entities and the Worldwide entities

and ultimately result in products going back to the customer?

A. I think I can.

All sales will originate out of Global Sales. We would call that the customer-basing part of our business. They are the ones --

Q. They talk to the customers?

A. Not the customers, they talk to the Wal-Marts, the Safecos, the Costcos, the Edgars, and others, and Global Sales would hopefully secure an order from them. And then it would do the forecasting process or communicate back with the manufacturing facilities that it has, in effect, retained to manufacture products for it, and provide them with orders that they need for delivery. So products then get made and they go off to the distribution centers and ultimately get shipped to the end customer.

Q. So the communication that Global Sales has with the manufacturers, that is sometimes worldwide, is that correct?

A. The manufacturer is sometimes worldwide, that is correct.

Q. Does Global Sales have any products manufactured by anyone besides Kimberly-Clark Worldwide?

A. It does, it has -- there is approximately 20-plus additional mill locations in the United States, which are owned by several different legal entities within the Kimberly-Clark family of legal entities, and Global Sales has the exact same arrangement with them as it does with Kimberly-Clark Worldwide.

Q. That is the cost-plus arrangement?
A. The toll manufacturing which is a cost-plus arrangement.
THE COURT: Basically, the way Kimberly-Clark has this structured it has one sales company; it has a number of manufacturing facilities, which are under different corporate umbrellas, all of those being part of the Kimberly-Clark family of companies.
THE WITNESS: That is correct.
THE COURT: Got it.
By the way, is that toll, T-O-L-L?
THE WITNESS: T-O-L-L, yes, a toll charge.
THE COURT: Got it.
BY MR. COOPERMAN:
Q. Mr. Wesley, this case, as you know, deals with diapers and training pants. Which manufacturers manufacture those products? We've already established that Worldwide is one of them. Are there others?
A. Yes. Again, in the U.S., because we obviously make thee products around the world, but in the U.S. there are three manufacturing facilities that make diapers and training pants. I've already mentioned the Ogden, Utah facility, which is owned by Kimberly-Clark Worldwide. There are two other facilities. One is located in Texas, in Paris, Texas, and the other is located in Beach Island, South Carolina, and both of those facilities are owned by Kimberly-Clark Corporation.

Q. Sir, do you have a sense as to about what percentage of the Huggies and training pants, the Pull-Ups, that are manufactured come from Worldwide as opposed to the Kimberly-Clark Corporation facilities?
A. Yes, there are three facilities. The production capacity of each of them is slightly different, but roughly one-third of our diapers manufactured in the U.S., and training pants as well, would come from the Ogden, Utah facility, which is the Kimberly-Clark Worldwide facility.
Q. OK. I want to go back to the chain that we spoke about.
I believe you said that after the products are manufactured, they go to distribution centers, is that right?
A. Yes, Kimberly-Clark Global Sales owns or operates distribution facilities. So as product comes off the end of the production line, it gets boxed up and those boxes will go to distribution centers. Those centers may be located physically adjacent to the manufacturing facility and so it could be owned by the manufacturer, but the operators, the people that work in those facilities, are Kimberly-Clark Global Sales employees.
There are also a series of distribution centers that are not affiliated with the actual facility itself, they will be stand-alone, strategically located throughout the U.S. to control cost, the costs of shipping, and those will be either owned or leased by Kimberly-Clark Global Sales and operated

with Kimberly-Clark Global Sales' employees.
Q. So Global Sales interfaces with the customer, places an order with Worldwide, Worldwide manufactures for Global Sales, and then sends it to distribution centers usually for Global Sales and certainly operated by Global Sales; is that correct?
A. That's correct. The same applies to the other manufacturing facilities. So if you wanted to get product for a Kimberly-Clark facility, we do the same thing as you just described for the Worldwide facility.
Q. So you do that, for example, for the Kimberly-Clark Corp. facility?
A. Yes.
Q. So why in the world have you set up the company with this structure, this toll manufacturing structure?
A. Yes. Toll manufacturing structures offer a number of efficiencies in operations. It allows us both from the actual physical side of it as well as the recordkeeping of it, as you could imagine, there is a lot going on and so our information technology systems, which was a very important part of this project, how do you pull this altogether, and we gain a lot of efficiencies and it allows us to see deep into the organization, to see the orders that you just described, the inventory levels, and by doing it the way we have done it, we get better efficiencies. It also allows you to eliminate duplicate roles for the various manufacturers and sellers so

there are some efficiencies there, and there were obviously some tax benefits, as well, from this structuring.
Q. Of the three facilities that you described that manufacture Huggies and manufacture Pull-Ups, you said that one of them is owned by Worldwide, correct?
A. Correct.
Q. Do any of the products that Worldwide makes, any of those Huggies or Pull-Ups, make their way to New York?
A. I would have to say I would expect that to be the case. You know, there is, again, our manufacturing footprint, where your put your facilities, you put your facilities in a way to minimize your costs. So in distribution trucking obviously is a significant cost. So most of the product I think that comes out of the Ogden facility is going to be destined for West Coast locations. The product manufactured in Texas, sort of the middle of the country. The product manufactured in South Carolina, the eastern side of the country.
That said, each facility doesn't make 100 percent of all of the products. In some cases it is more efficient to run a product through a particular mill and not have the other mills manufacture it. So I would expect some volume of products coming out of the Ogden mill -- Ogden, Utah mill -- will eventually end up on the East Coast
Q. Just to clarify, the products -- of course, we are talking now about diapers and training pants -- are those

Kimberly-Clark Worldwide products or are they Global Sales' products or are they entities' products?

A. They are Kimberly-Clark Global Sales' products, and Kimberly-Clark Global Sales has arranged for them to be manufactured using the intellectual property that it has licensed from Kimberly-Clark Worldwide.

Q. Does Kimberly-Clark Global Sales have the right to have products manufactured by others besides Kimberly-Clark entities?

A. It does. We would call those certified suppliers.

Q. OK. I want to go back to Kimberly-Clark Worldwide for a moment.

You described the manufacturing services it provides, the toll manufacturing, and we all know that it's also an IP holding company. So those are two functions it serves.

Are there any other functions that it serves in the enterprise?

A. It is also the entity within Kimberly-Clark wherein a very high percentage of our foreign subsidiaries, their ultimate ownership comes through that entity. So if you looked at Worldwide and said where does Worldwide get most of its money, most of its money comes up through its foreign subsidiaries, the earnings that they make from overseas. Most of its money is from overseas.

Q. Let's turn to licensing in a little bit more detail. Her

Honor asked some of those questions in her note to us.

Could you explain what licensing relationship exists between Worldwide and Global Sales?

A. Yes. There is a license agreement that Kimberly-Clark Global Sales has entered into with Kimberly-Clark Worldwide. Worldwide owns the intellectual property, has licensed it to Global Sales. In exchange, Global Sales pays it a licensing fee.

Just to complete the chain, with that license and the right to have the products manufactured, Global Sales turns around and enters into agreements, gives a license to manufacturers so that they can use it, as well as have a supply agreement with them so that they can manufacture products for Kimberly-Clark Global Sales.

Q. Before I forget, I want to backtrack for a second and just clarify: In terms of responsibilities, does Worldwide sell or market any products?

A. No, it does not.

Q. OK. So back to licensing.

Are the three patents in suit the only intellectual property that Worldwide licenses to Global Sales?

A. No.

Q. So what has been licensed?

A. Essentially all of the intellectual property that Global Sales would need to be able to have manufactured and then sell

the products. So, brand names, trademarks, know-how, and then patents for products that are not in dispute, Kleenex and paper towels and tissue products and medical products. We have a medical products division as well.

Q. Do you have any approximation of how many patents, for example, Worldwide has licensed to Global Sales?

A. There is a very long list in the license agreement. I don't know the exact number but it numbers in the hundreds, if not more.

Q. Is it possible that number is in the thousands?

A. It is very possible it is in the thousands.

Q. Has Kimberly-Clark Worldwide licensed the patents in suit to anyone besides Kimberly-Clark Global Sales?

A. Yes, it would have had to license them to -- it would have had to, and it did, license them to Kimberly-Clark Corporation so Kimberly-Clark Corporation could manufacture diapers and training pants.

It would have also manufactured -- it would have licensed those patents to foreign operations, or the foreign equivalent of those patents, where those products will be used by Kimberly-Clark's facilities overseas.

Q. Has Kimberly-Clark Worldwide licensed its patents or the patents in suit to anyone who is unrelated to Kimberly-Clark, a third party?

A. Yes, I am aware of at least three of those, two of which

that license is to what you would call a private-label manufacturer. That is a company that would manufacture products for a store, like Wal-Mart, as private label, others, and grocery stores that have their own private label. So there is one company in Canada that has that license and uses it for sales of products in North America, and there is a company in Europe as well as Australia, the same company, that has a license to private-label products in those jurisdictions.

Q. Just to be clear to make sure I understand, Kimberly-Clark Worldwide has licensed at least a couple of patents in suit to non-Kimberly-Clark entities that then manufacture and sell diapers and/or training pants into the United States?

A. That's correct.

Q. Could you identify those -- is the identification of those companies, is that confidential?

A. We don't normally disclose that. I don't feel that is it is necessary -- I am trying to make the point that who our customers are and who has these licenses is not something that we would normally publicly disclose. We haven't done that, but if it is important here, I don't feel that it is so secret that I can't give you the names.

MR. COOPERMAN: Would your Honor like to know that?

THE COURT: The ultimate question is where I want to know it. I don't think I need to know it necessarily, but I don't know what your clients think. But let's move on.

MR. COOPERMAN: OK.

BY MR. COOPERMAN:

Q. Could you tell us what products Kimberly-Clark manufactured that use our incorporated patents that are involved in this lawsuit?

A. Kimberly-Clark Corporation or --

Q. Thank you. At Kimberly-Clark Worldwide, what products are manufactured that are covered by the patent in suit?

A. Kimberly-Clark Worldwide at their Utah facility will make diapers and training pants, and I understand that there are three patents that are in issue in this case that relate to diapers and training pants.

Q. So that is Huggies and Pull-Ups, is that right?

A. Yeah, those would be the brand names, correct, as well as some private label that we do ourselves.

Q. Are you aware if the license agreements with these third parties -- let me back up -- are exclusive or nonexclusive?

A. I know that the license agreements exist. I per se have not seen the license agreements, and I don't believe they are exclusive since Kimberly-Clark itself was using them in other jurisdictions as well. But I'm not sure how to answer that correctly.

Q. You are not sure?

A. I don't know.

Q. What control does Kimberly-Clark Worldwide exert over

Kimberly-Clark Global Sales in terms of its business operations or strategic goals?

A. Kimberly-Clark Worldwide is a licensor, and that's really -- its level of interest in what Kimberly-Clark Global Sales does is really limited to making sure that it is protecting the intellectual property that it owns, like any licensor would, and that is primarily done through quality control. You want to make sure that the product that's being manufactured and distributed using your tradenames, trademarks, brands, and the underlying features of the patented products is being done according to specs and done appropriately. So they have rights to approve products, final products, how they come off the production line, in that sense. They don't control the management of Global Sales. They don't tell Global Sales where to sell products, that sort of control.

Q. So then the control you are talking about, the products' quality control, is that sort of a trademark quality control since the Kimberly-Clark Worldwide trademarks are appearing on the Global Sales' product?

A. Correct.

THE COURT: It is real easy to control the quality if you are the one who is doing the manufacturing.

THE WITNESS: Well, they have -- that's easier when it is Worldwide manufacturing, but there are other entities that manufacture as well. So they exert what is called a control

influence, if you will, on all manufacturers.

THE COURT: To the extent that it manufactures diapers that are sold in the United States, that's its method of exerting quality control?

THE WITNESS: Yes, I agree with that.

THE COURT: It controls the quality by doing it itself?

THE WITNESS: It is checking its own work.

THE COURT: It is a great way to protect your patent and your trademark.

BY MR. COOPERMAN:

Q. Does Worldwide have any say in who the executives are of Global Sales?

A. No.

Q. About how many employees does Kimberly-Clark Worldwide have?

A. I don't know the exact number. Its employees will consist of the manufacturing employees at its three facilities as well as employees who are focused on protecting the intellectual property, like the intellectual VIP lawyers, as well as the long-range research and development people.

Q. Do any --

A. But probably, I'm just -- I will throw out a number that I think is roughly right but it could be off by 10/20 percent, but I think that number is between 1,000 and 1200 employees.

Q. About how many employees does Global Sales have?

A. I don't know that number either. It is the sales force and quite a few other operations and it's significantly more.

Q. Significantly more than Worldwide?

A. Mm-hmm.

Q. Is that a yes?

A. I'm sorry, yes.

Q. How many employees -- or does Worldwide have any employees in New York?

A. No.

Q. Does Worldwide exert any control or any say over the operational policies or marketing of the products it manufactures for Global Sales?

A. I'm sorry, could you say that again, please?

Q. Sure. Does Worldwide exert any control over the operational policies or marketing of the products it manufactures for Global Sales?

A. Not directly. Again, the only control they will have would be to the extent it related to the quality control and trademark protection. So for an example, if Global Sales or any -- if Global Sales wanted to use an advertising program that was damaging to the brands, they wouldn't be able to do that.

Q. So, now, isn't it true that -- or does Kimberly-Clark Worldwide receive some financial benefit from Global Sales

selling products into New York?
A. I think the answer is probably yes.
Q. In what way?
A. Two ways. To the extent that a product is manufactured by Kimberly-Clark Worldwide in Utah and it finds its way into New York, Worldwide is compensated for the manufacturing of that product on a cost-plus basis, as I mentioned that earlier.
The other way it would receive compensation is the license agreement that it, that Global Sales, has with Kimberly-Clark Worldwide calls for Global Sales to pay a licensing fee to Worldwide, and that licensing fee has varied over time; it has been different at different times. In 2007, and really from 2003 until 2007, it was a flat fee. So in that sense there was no -- it didn't matter where the products were sold, it was still going to be a flat fee.
We're currently working on a project where that's going to be changed on a going-forward basis, starting with 2008. That is going to be based on a formula that's called residual profits methodology, very common in the transfer pricing world, pretty complicated, and we are not done with our formula. We haven't figured it out completely yet.
Q. So at the time this lawsuit was filed, which is December of 2007, then there was a flat-fee royalty, is that right, that Global Sales paid to Worldwide for its intellectual property?
A. That's correct. So regardless of the sales volume or where





products were sold, there was still a flat fee.
Q. I want to go back to the financial benefit question again.
Would it be true that any shareholder of Kimberly-Clark publicly available stock would receive some financial benefit based on sales of Kimberly-Clark products into New York?
A. Sure.
THE COURT: Wait. I don't have my realtime up.
What was that question?
BY MR. COOPERMAN:
Q. The question was: Would a shareholder of Kimberly-Clark Corporation receive a financial benefit from sales of product into New York by Kimberly-Clark Global Sales?
A. I think the answer to that would be yes. To the extent that sales are made, profits are generated, a shareholder of Kimberly-Clark Corporation benefits from them.
THE COURT: Kimberly-Clark Corporation is the public company, right?
THE WITNESS: It is the ultimate parent entity, which is a public company, correct, your Honor.
BY MR. COOPERMAN:
Q. Can you give us a sense of about how much in its annual revenues Worldwide gets from its manufacturing relationship with Global Sales?
A. I can't give you precise numbers. I can tell you that it





is a relatively small number from Worldwide's perspective. Most of what Worldwide will make, or where it gets its most significant source of revenue, is from dividends and profits that come from the foreign subsidiaries, all of which are ultimately, or most of which are ultimately owned by that entity, by Worldwide.
Q. Do you have any sort of approximation in terms of percentage of revenues that Worldwide makes from its manufacturing relationship with Global Sales, approximately?
A. Of Worldwide's income?
Q. Yes, of Worldwide's income.
A. I don't have that exact number. I would roughly guess that it is less than a quarter of its revenue, maybe even significantly less than that.
Q. Does Global Sales license intellectual property from other companies for its diapers?
A. I believe that it does. I believe it needs to license technology from other people. Not all the technology that we use is owned by Kimberly-Clark.
Q. What about trademarks and copyrights and things like that, does it sometimes license intellectual property in designs that go on diapers, for example?
A. Sure. A common example is licensing from a company like Disney or Pixar where you would put it on your diaper or your product a design to make it more enticing to the consumer to





buy.
Q. And would these third parties who are unrelated to K-C but have this trademark licensing relationship also exert quality control over the products that K-C Global Sales is selling?
A. Yes, global products.
MR. COOPERMAN: Can I have a moment, your Honor, please?
THE COURT: Sure.
(Pause)
MR. COOPERMAN: Nothing further, your Honor.
THE COURT: OK. This is what I am going to do. I've got some folks who actually, God bless you, want to put a settlement on the record to take a case off my trial calendar. I need to deal with them now. They have been here since 10 o'clock this morning. They actually got in through the magnetometers early. I would like to deal with them now and get them off.
Can you guys go to lunch and come back at about 10 of 2?
MR. COOPERMAN: Certainly.
THE COURT: Thank you very much.
Sorry, sir.
THE WITNESS: That is all right. Thank you.
(Luncheon recess)

A F T E R N O O N S E S S I O N

2 p.m.

THE CLERK: Hearing continuing in 07 Civil 11202.

THE COURT: OK. Mr. Wesley, would you mind resuming that seat. Thank you, sir.

THE WITNESS: Sure.

JOHN W. WESLEY,

Resumed, and testified further as follows:

THE COURT: All right. Do we have some cross-examination here?

MR. SIFF: Yes, your Honor.

Your Honor, if I could approach the witness now just to provide him with just some things that I might be asking him about?

THE COURT: Sure.

MR. SIFF: Thank you.

CROSS-EXAMINATION

BY MR. SIFF:

Q. Good afternoon, Mr. Wesley. How are you?

A. I'm fine. Thank you.

Q. Good. I've put in front of you a couple of bags there. Do you recognize those bags?

A. Sure.

Q. And those would be?

A. There is a package of Huggies Pull-Ups and a package of

Huggies Supreme Natural Fit Diapers.

Q. Do both of those bags have on them the famous Huggies trademark?

A. Yes.

Q. And are those diapers and training pants sold in New York?

A. I would assume that they are, yes.

Q. And with respect to the trademarks, is there goodwill associated with the sale of those brands of diapers and training pants?

A. There is goodwill associated with trademarks.

Q. And that goodwill reverts back to the owner of the trademarks, is that correct?

A. That is correct.

Q. And Kimberly-Clark Worldwide is the owner of the trademarks?

A. That is correct.

Q. And, therefore, Kimberly-Clark Worldwide, as owner of the trademarks, reaps the benefits of the sale of those products in New York?

A. In what way?

Q. Well, you mentioned that there was goodwill associated with the sale of those products that have that trademark on them, is that correct?

A. That's correct.

Q. And that goodwill reverts back to Kimberly-Clark Worldwide,

and that goodwill also goes to increasing the value of the trademark, Huggies, is that correct?

A. I'm not a valuation expert. I would assume that that is the answer but that is beyond my personal knowledge.

Q. Do you know what the value of the Huggies' mark is?

A. It's considerable, billions of dollars.

Q. Billions of dollars.

And part of that billions of dollars is due to sales of the Huggies brand diapers and training pants in New York?

A. I would assume that to be the case, yes.

Q. And in the end is it important to Kimberly-Clark Worldwide that these products are sold in New York?

A. Kimberly-Clark Worldwide, as the owner of the intellectual property, has licensed it. So, yes, as a licensor of intellectual property, it would hope that that product is sold everywhere.

Q. Everywhere, and New York included, correct?

A. New York included.

Q. And it is important to Kimberly-Clark Worldwide that those products are sold in New York, correct?

A. I don't parse words with you. It is important for Kimberly-Clark and the products we sold. If the products are sold outside of New York, that's fine. I have got no --

THE COURT: In other words, as far as Worldwide is concerned, the more places it sold, the better?

THE WITNESS: Without a question.

Then we would like --

THE COURT: Anywhere and everywhere would be fine?

THE WITNESS: And Worldwide would definitely like to see its products sold in New York and every other state and in every other country.

BY MR. SIFF:

Q. Is there copyrightable material on those bags that helps sell those products?

A. Copyrightable, yes.

Q. Are there pictures on there and graphics and artwork and things of that nature?

A. There certainly is.

Q. Do you know who the owner of that copyrightable material is?

A. Some of it I'm assuming is off -- well, again, I'm not an expert, I don't know everything that's on here.

There are certainly marks from Disney. Disney obviously is going to have its own rights on those. We would have licensed those from Disney. But the other materials are going to be owned by Kimberly-Clark Worldwide.

Q. I think if you turn the package to at least one side of there, I believe it will tell you that Kimberly-Clark Worldwide owns copyrights regarding what is shown on the packaging; is that correct?

I believe it is on one of the shorter sides, as opposed to the bases. The pink box, it would be on the bottom. Is it in there?

(Pause)

It is in small print.

THE COURT: Why don't you show him what you are talking about.

THE WITNESS: I have the location. I am just trying to read it.

A. The package will show that there is copyrights, a C in a circle, the copyright symbol, and that it is owned by Kimberly-Clark Worldwide or "KCWW," as it says here.

Q. Thank you. And just so the record is clear, that would be the same for the other bag, which is the diapers?

A. I see it says, "Distributed by Global Sales."

(Pause)

MR. SIFF: Your Honor, if it would help --

A. The same mark, Kimberly-Clark Worldwide, KCWW.

Right below it is the mark for Disney, showing that they have a copyright in the name of Winnie The Pooh.

Q. Other than that, the copyrights are for Kimberly-Clark Worldwide, correct?

A. That's what it says.

Q. And those copyrights or that copyrightable material helps sell those products, correct?

this lawsuit?

A. Again, my discussions have not -- well, it didn't say -- I don't know, for example, that all three patents apply to both products.

THE COURT: I don't think it is disputed.

THE WITNESS: I believe that the three patents --

THE COURT: Is it disputed?

MR. COOPERMAN: There is no dispute about that, your Honor.

THE WITNESS: I just don't know.

THE COURT: You don't know but the lawyer knows them.

MR. SIFF: The same would be true -- I would assume, your Honor, there is no dispute that those patents cover the training pants, as well. I don't mean to parse training pants and diapers. I just want to make sure that that is correct.

MR. COOPERMAN: I have been advised that it is our position not all three cover but at least some of them do.

THE COURT: Fine. Is there any dispute that the four E patents cover processes or features that are incorporated into Huggies' products, either diapers or training pants or both.

MR. COOPERMAN: There is no dispute about that, your Honor.

THE COURT: Fine. I didn't think so.

BY MR. SIFF:

A. That is correct.

Q. Next to you I have also placed a copy of each of the patents in suit in this case?

MR. SIFF: Your Honor, if it would help, I could read those numbers into the record or if it is necessary I will just move on.

THE COURT: It is not necessary.

BY MR. SIFF:

Q. Are you familiar with those patents?

A. No, I'm not. I'm not personally familiar with the patents. I never read the patents before. I've never seen the patents before.

Q. Are you aware of whether or not let's start with diapers are covered by any or all of those patents?

A. I have been told that they do.

Q. I'm sorry?

A. I have been told that the patents, these patents, which you are representing that these patents are the patents that are at issue --

Q. Yes.

A. -- and I have been told, in getting ready for this discussion today, that these patents at issue go to the processes and features of diapers and training pants.

Q. And just so it's clear, when you refer to "those patents," you are referring to all three of those patents that are in

Q. Mr. Wesley, when the patented products, training pants and diapers, are sold in New York, is Kimberly-Clark Worldwide exploiting its patents?

A. I don't know how to answer that question. I could tell you how it works. Whether it is exploiting or not exploiting, I don't know what that word means.

Q. Well, do the sale of training pants and diapers put Worldwide in a position to ask for royalties for those patents?

A. Yes, and it does -- and it gets royalties.

Q. So in fact --

A. It gets a licensing fee.

Q. And in fact it gets a licensing fee.

And who does that licensing fee come from?

A. Kimberly-Clark Global sales.

Q. So the sales of the diapers then, at least in the context of the question I asked, the sale of the diapers and training pants does exploit the patents in the sense that Kimberly-Clark Worldwide does receive money for those patents?

A. Kimberly-Clark Worldwide receives a licensing fee from Global Sales. Now, I'm not trying to parse words. I don't know what the word "exploit" means. I have no idea of whether the word exploit has legal significance at all.

THE COURT: It is OK. I understand your answer.

Your answer is that Worldwide licenses the patents, it gets a fee for that, and until now or recently, a flat fee, not

contingent on the amount of sales.

THE WITNESS: Correct.

THE COURT: But that is about to change?

THE WITNESS: Right.

THE COURT: If you guys can work out the formula.

THE WITNESS: Correct.

THE COURT: OK.

BY MR. SIFF:

Q. Are there other products that Kimberly-Clark Global Sales sells in New York on behalf of Kimberly-Clark Worldwide?

A. I assume the answer is yes. Well, let me back up a second.

It doesn't sell on behalf of K-C Worldwide. It sells on behalf of itself. It is the entity, the sale, the customer-facing entity that actually sells our products.

Now, there are other products that Kimberly-Clark Global Sales will sell in New York that use intellectual property that is obtained from K-C Worldwide.

Q. What products are those?

A. Kimberly-Clark Worldwide owns all of the products, all of the intellectual property for all of Kimberly-Clark's various products and Global Sales sells all of those products. So it is tissue, like Kleenex. It's toilet paper. It's paper toweling. It's medical products.

Q. And with respect to -- and the paper towels are Scott towels?

A. Scott?

Q. Yes.

A. Primarily Scott.

Q. So with respect to Kleenex and Scott towels, is there goodwill associated with the sale of those products?

A. Again, I'm not trying to parse words with you. I know enough to know that goodwill is a legal concept, and I don't know what it means beyond that. So you are asking me to confirm for you that a legal issue, goodwill, is attached to any of these sales. I just don't know that.

I can make some assumptions, as anybody would.

THE COURT: You don't have to make any assumptions. If any assumptions have to be made, I will make the assumptions.

Q. Let me put it to you simple: Does the sale of Kleenex and Scott towels increase the value of those trademarks?

A. I'm not going to assume. With the judge's instruction, I don't know how the valuation of a trademark works so...

Q. Do you have any idea of how much the Kleenex, the value of the Kleenex mark is?

A. It is also a billion-dollar brand.

Q. How about the Scott trademark?

A. It is a billion-dollar brand. That means a billion dollars of sales. The brands are worth certainly more than that.

Q. Does Global Sales sell those products in New York?

A. Yes, it does.

Q. Who is the owner of those trademarks, Kleenex and Scott towels?

A. Kimberly-Clark Worldwide.

Q. If Global Sales did not exist, would Worldwide -- Kimberly-Clark Worldwide stop selling diapers in New York?

A. No -- I'm sorry, say that again.

Q. Sure. If Kimberly-Clark Global Sales did not exist, would Kimberly-Clark Worldwide stop selling diapers in New York?

A. Well, it doesn't sell diapers in New York. So I'll say definitely if Kimberly-Clark Global Sales were to go away, would there be some other entity out there that might sell the products? The answer to that would be yes. Could it be Worldwide? Yeah, it could be Worldwide. Could it be another Kimberly-Clark entity? Yeah, it could. We chose to structure it differently.

THE COURT: I think his question probably is a little bit different.

Would Worldwide stop dealing in diapers and diaper-related trademarks and patents if Global Sales were to disappear? Would we no longer see Huggies in the world if Global Sales were to disappear?

THE WITNESS: No. Obviously, the answer is that we would find a way to sell the product. Kimberly-Clark Corporation or the enterprise would find a way to sell the

product if this legal entity didn't exist.

MR. SIFF: Thank you.

BY MR. SIFF:

Q. Under the license agreement, does Kimberly-Clark Global Sales have the right to enforce Kimberly-Clark Worldwide's patents?

A. Yes, it does. The right would go first to K-C Worldwide, and if K-C Worldwide chose not to enforce the right, then K-C Global Sales would have that right.

Q. Is there a situation where Worldwide and Global Sales would sue together, meaning bring the suit together?

THE COURT: If you lift up that microphone just a little bit. I think it is at an angle for you, for a slightly shorter person.

A. I think the answer to that is yes. I understand there is a proceeding in Texas where both parties are the plaintiff.

Q. Is Kimberly-Clark Global Sales licensed to do business in New York?

A. Yes, Kimberly-Clark Global Sales is the entity that does business in New York.

MR. SIFF: No further questions, your Honor.

MR. COOPERMAN: Your Honor, may I do just a brief redirect, please?

THE COURT: Absolutely.

MR. COOPERMAN: Thank you.

REDIRECT EXAMINATION
BY MR. COOPERMAN:
Q. Just a few questions, Mr. Wesley.
I believe at some point, under questioning by Mr. Siff, you testified that Worldwide would like to see its products sold everywhere. I just want to go back and clarify.
What products does Worldwide have, Worldwide have, if any?
A. Worldwide doesn't have products; Worldwide has intellectual property. So we would like -- Worldwide would like to see products sold by somebody that bears its intellectual property.
Q. You also said that K-C Corp. would find a way to sell products if K-C World sales didn't exist. I think you said something like that. Does that sound right?
A. That is correct, yes.
Q. Is K-C Worldwide situated to sell and market products at this point?
A. No, it has no sales force. It has no connections to the customers.
Q. So it couldn't just immediately take up the slack?
A. No, it could not.
Q. I believe you also testified that K-C Global Sales could sue under the patent if K-C Worldwide didn't sue.
Are you sure that you don't need to have the patent owner involved in the lawsuit in order to bring suit under a

patent?
A. I have not gone back to read the license agreement, but my recollection was that it had the ability for the patent owner to bring claims, and if the patent owner chose not to, then the licensee could step in and defend the action or to assert an infringement action.
Again, I did not go back to reread that before I came here today.
Q. OK. So you're not positive about the terms of the agreement?
A. That is correct.
Q. Or how the law works with regard to requiring patent owners to be parties to a lawsuit?
A. I would have no idea of what the law says in this area.
Q. And then just to wrap up, could you give us a summary of how the K-C Global Sales, K-C Worldwide and K-C Corporation structure exists? Could you give us a sense for what each is responsible for doing in the conglomerate?
A. Yes, I could try.
Just the ownership structure starts with Kimberly-Clark Corporation as the ultimate parent entity. It has two subsidiaries -- it actually has hundreds, but the two that are relevant for this are Kimberly-Clark Worldwide and Kimberly-Clark Global Sales, and Global Sales is the entity that has been structured and set up so that it is the entity

that makes all of the sales of products in the U.S. So every product that Kimberly-Clark sells in the U.S. is sold by K-C Global Sales. That is what it says on these packages as well, that they are distributed by them.
Q. Does K-C Corp. do any sales?
A. It does not.
So K-C Worldwide has the three manufacturing facilities that I testified to before and K-C Corporation has 17 or so manufacturing facilities, and those manufacturing facilities all manufacture product on behalf of -- at the request of Global Sales so that Global Sales can sell that product in the marketplace.
Q. And do these entities give each other instructions as far as how to run their operations? Does KCC, for example, instruct K-C Global Sales as to how to run its operations, or is it independently run?
A. It is -- then there is coordination, as you would expect, between manufacturers, sellers. Who gives instructions, I'm not sure how to answer that. But there certainly is -- it is a well-oiled machine. It is a very coordinated process.
Q. Does K-C Worldwide, for example, give direction to K-C Global Sales as to its business strategies or the markets it should be seeking or the customers it should be selling to?
A. No, it does not direct the sales force or the marketing efforts. That's done by Kimberly-Clark Global Sales.

Q. Are there separate boards for each of these corporations?
A. Each is a separate legal entity. Each has a board of directors and officers, as required by law.
MR. COOPERMAN: I have nothing else, your Honor.
(Pause)
THE COURT: OK. Thank you so much, Mr. Wesley.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: You've brought another witness also?
MR. COOPERMAN: Yes, we have. Ms. Margolis is here. I --
THE COURT: You may have covered everything with Ms. Margolis, but your client actually may have some questions about the licensing and such that Mr. Wesley wasn't able to answer. I'm glad to hear from Ms. Margolis.
MR. COOPERMAN: Could we have one minute to decide whether we need to put Ms. Margolis on?
THE COURT: Sure.
MR. COOPERMAN: Thank you very much.
(Pause)
MR. COOPERMAN: We have no direct for Ms. Margolis.
THE COURT: Do you have any cross for Ms. Margolis?
MR. SIFF: No, your Honor, we are fine. Thank you, your Honor.
THE COURT: Well, too bad, Ms. Margolis, nobody wants

844darqh

to talk to you.

MS. MARGOLIS: I'm sure there will be other opportunities, your Honor.

THE COURT: OK. So that does flesh out the record in an appreciable way, and I thank you, both of you, for coming today on short notice. I genuinely appreciate it.

And the whole thing is kind of an intriguing proposition. So what I would suggest is that now that we've gotten the relevant facts on the table, that, you know, each of you take ten days to put in your view on how it does or does not support the exercise of the personal jurisdiction over Worldwide, and that will resolve that question. And if I think I have jurisdiction, I am going to keep the case, and if I don't think I have jurisdiction, it is going to Texas.

That's the easy answer. OK? All right?

MR. SIFF: Very good, your Honor.

THE COURT: Very interesting. Very interesting.

Thank you.

ALL COUNSEL: Thank you, your Honor.

\- - -

INDEX OF EXAMINATION

| Examination of: | Page |
| --- | --- |
| JOHN W. WESLEY | |
| Direct By Mr. Cooperman . . . . . . . . . . | 8 |
| Cross By Mr. Siff . . . . . . . . . . . . . | 29 |
| Redirect By Mr. Cooperman . . . . . . . . . | 41 |