UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ _____x

ARQUEST, INC.,

        Plaintiff,

    -against-

KIMBERLY-CLARK WORLDWIDE, INC.,

        Defendant.
_____ _____x

07 Civ. 11202 (CM)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/31/08

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, ALTERNATIVELY, TO DISMISS OR TRANSFER

McMahon, J.:

       Plaintiff Arquest, Inc. ("Arquest") brings this declaratory judgment action against

Kimberly-Clark Worldwide, Inc. ("KCWW"), seeking a declaration of noninfringement and

invalidity as to two patents, and a declaration of noninfringement, invalidity, and

unenforceability as to one patent. KCWW now moves to dismiss for lack of personal

jurisdiction, or, in the alternative, to decline declaratory judgment jurisdiction or to transfer the

case. For the reasons that follow, defendant's motion to dismiss is granted.

**The Parties**

       Arquest is a privately-held Arkansas corporation with its corporate headquarters in New

Jersey. (Pls.' Decl. (Rinaldi) ¶ 2-5, Dkt. # 22.) Arquest designs, manufactures, and distributes

private-label diapers and training pants. (Id. at ¶ 2.) Its approximate annual revenues are $125

million. (Id.) Arquest develops its products in New Jersey and Arkansas, and its manufacturing operations take place in Arkansas. (Id. at ¶ 4.)

Kimberly-Clark Worldwide is a Delaware corporation with its commercial domicile in Texas. (Defs.' Decl. (Misun) ¶ 4, Dkt. # 13.) KCWW has major administrative sites in Texas, Georgia, and Wisconsin. (Id. at ¶ 5.) Its manufacturing facilities are located in California, Washington, and Utah. (Id. at ¶ 6.) Long range research for KCWW is conducted in Georgia, quality control occurs in Georgia and Wisconsin, and most of Kimberly-Clark's intellectual property lawyers are located in those two states. (Id. at ¶ 9-11.) KCWW owns the majority of the patents and trademarks of the global Kimberly-Clark entities. (Id. at ¶ 4.) KCWW does not operate in New York (Id. at ¶ 12,), nor is it registered or licensed to do business in New York (Id. at ¶ 13.) It has no property in New York, nor does it have employees in New York. (Id. at ¶ 12.) KCWW has no sales force and no customer base. (4/4/08 Hr'g. Tr. ("Tr.") 41:16-19, Dkt. # 30.) It does not sell or market any products. (Id. at 18:16-18.)

**Background**

The following facts are taken from the complaint and affidavits of all parties, and are construed in the light most favorable to the plaintiff non-movant. See, e.g., CutCo Indus. Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986).

On or about June 28, 2007, KCWW's lawyer in Wisconsin contacted Arquest's counsel in New York to notify Arquest that KCWW believed certain Arquest products infringed certain KCWW patents. (Pls.' Decl. (Siff) ¶ 2, Dkt. # 21.) KCWW would not discuss specifics until a stand-still agreement was in place that would prevent either party from filing suit during negotiations. (Id. at ¶ 4.) The Stand-Still Agreement arrived at by the parties granted KCWW a

2

three-day exclusive window to file suit in the forum of its choice. (Id. at ¶ 5.)

After the first Stand-Still Agreement was executed on July 18, 2007, KCWW's lawyer informed Arquest that it believed Arquest's products infringed three KCWW patents. (Id. at ¶ 6.) In the six months that followed, the parties entered into seven additional Stand-Still Agreements, during which time the parties discussed issues relating to the alleged infringement of KCWW's patents and engaged in negotiations regarding potential settlement frameworks and revisions to Arquest's product designs. (Id. at ¶ 7-10.)

The eighth Stand-Still Agreement expired on December 6, 2007, at which time KCWW said it was unwilling to enter into a further Stand-Still Agreement. (Id. at ¶ 11.) KCWW did not file suit during the three-day exclusive window afforded to it under the Stand-Still Agreements (*i.e.*, by December 10), and settlement negotiations continued. (Defs.' Decl. (Margolis) ¶ 7, Dkt. # 12.) On December 12, 2007, Arquest filed this declaratory judgment action, but it did not immediately serve KCWW with the complaint. (Pls.' Decl. (Siff) ¶ 16.) Instead, on December 13, Arquest's counsel notified counsel for KCWW that it had filed the New York complaint, but did not intend to serve it immediately on KCWW. (Id.)

That same day, KCWW – along with Kimberly-Clark Global Sales, Inc. ("KCGS") – filed suit against Arquest in the Northern District of Texas, alleging infringement of the same three patents at issue in Arquest's action before this Court. (Defs.' Decl. (Margolis) ¶ 14.) After being served with the Texas complaint on December 13, Arquest served KCWW with the New York complaint on December 14, 2007. (Id. at ¶ 14-15.)

**Procedural History**

On April 4, 2008, this Court held a hearing to flesh out the facts behind defendant's

3

motion to dismiss for lack of personal jurisdiction, because defendant's papers in support of its motion were wholly insufficient. (4/2/2008 Letter from the Court, Dkt. # 29.) The issues to be addressed at the hearing included, among others: the ownership and manufacture of Kimberly-Clark products bearing the intellectual property at issue in this case, the licensing arrangement between KCWW and KCGS (its sister company), and the general nature of KCWW's operations. Id.

**The Hearing**

At the April 4, 2008 hearing, John Wesley, an officer of both KCWW and KCGS as well as the chief counsel of corporate transactions for Kimberly-Clark Corporation testified about the nature of KCWW's relationship to its sister company, KCGS. (4/4/08 Hr'g. Tr. ("Tr.") 9:3-9, Dkt. # 30.) KCGS is present in New York through its distribution and sale here of Kimberly Clark products such as Huggies ® diapers and Pull-Ups® training pants ("the products"). (Defs.' Supplemental Mem. 5, Dkt. #32.) These products are manufactured by KCWW.

KCWW has three manufacturing facilities, one in Fullerton, California, one in Everett, Washington, and the third in Ogden, Utah. (Tr. 9:15 - 10:10.) Of those three, only the Ogden, Utah facility manufactures diapers and training pants (Id. at 10:14-17) such as those at issue in this case.

KCWW manufactures these products in Ogden, Utah at the request of KCGS. (Id. at 10:20-21.) The two companies have a supply agreement whereby KCGS secures orders from customers (such as Wal-Mart, Safeco, Costco, Edgars and others) (Id. at 12:7-9), purchases all the raw materials that are used to manufacture the diapers and training pants and delivers them to KCWW in Utah. (Id. at 10:20-25.) According to Mr. Wesley, KCGS essentially 'retains' KCWW

4

to manufacture the products necessary to fill the orders that it has secured. (Id. at 12:7-15.) This

process is known as toll manufacturing which is an approach to manufacturing wherein

> the entity that is selling the goods, in this case KC-Global Sales, has contracted with
> manufacturers to make products for it, and it has contracted with K-C Worldwide to
> make its products, both the tissue and everything else, as well as the diapers, out of
> Ogden. And for that K-C Worldwide is compensated by Kimberly-Clark Global Sales
> on a cost-plus basis.[1]

(Id. at 11:12-22). In other words, KCGS "interfaces with the customer, places an order with

Worldwide, Worldwide manufactures for Global Sales, and then sends [the products] to

distribution centers usually for Global Sales and certainly operated by Global Sales." (Id. at 15:2-

6.)

According to Mr. Wesley, Kimberly Clark engages in toll manufacturing in order to

maximize "efficiencies in operations . . . eliminate duplicate roles for [its] various manufacturers

and sellers," garner "tax benefits," and exercise quality control over the products that bear its

intellectual property. (Id. at 15:15-25, 16:2, 22:3-15).

The record indicates that KCGS has the "exact same arrangement" (Id. at 12:24-25)

described above with "twenty-plus" other legal entities within the Kimberly-Clark "family of

legal entities." (Id. at 12:21-25) These other entities include Kimberly-Clark Corporation (KCC)

which itself owns two facilities that manufacture diapers and training pants. (Id. at 13:18-25.)

These facilities are located in Paris, Texas and Beach Island, South Carolina. The record further

reflects that "roughly one-third" of the diapers and training pants manufactured by Kimberly-

Clark in the U.S. are manufactured in the Ogden, Utah facility owned by KCWW. (Id. at 14:5-9.)

When asked whether diapers manufactured in Utah make their way to New York, Mr.

---

[1] According to Black's Law Dictionary, a cost-plus contract is one "in which payment is based on a fixed
fee or a percentage added to the actual cost incurred."

Wesley responded,

> I expect that to be the case. . . . In distribution trucking obviously is a significant cost.
> . . . So most of the product I think that comes out of the Ogden facility is going to be
> destined for West Coast locations. The product manufactured in Texas [by KCC],
> sort of the middle of the country. The product manufactured in South Carolina [also
> by KCC], the eastern side of the country. That said, each facility doesn't make 100
> percent of all the products. . . . So I would expect some volume of products coming
> out of the Ogden, Utah mill will eventually end up on the East Coast."

(Id. at 16:9-23.) Mr. Wesley also testified that KCGS has "the right to have products

manufactured by others, besides Kimberly-Clark entities," known as "certified suppliers." (Id. at

17:7-10.)

In addition to manufacturing some of the products at issue in this case, KCWW also

holds the intellectual property that is utilized in the products. (Id. at 17:3-6.) "There is a license

agreement that Kimberly-Clark Global Sales has entered into with Kimberly-Clark Worldwide.

Worldwide owns the intellectual property, has licensed it to Global Sales. In exchange, Global

Sales pays it a licensing fee." (Id. at 18:4-8.) Mr. Wesley further testified that "with that license

and the rights to have the products manufactured, Global Sales turns around and enters into

agreements, gives a license to manufacturers so that they can use it, as well as have a supply

agreement with them so that they can manufacture products for Kimberly-Clark Global Sales."

(Id. at 18:9-14.) The license agreement between KCWW and KCGS makes available to KCGS

"essentially all of the intellectual property that Global Sales would need to be able to have

manufactured and then sell the products." (Id. at 18: 24-25, 19:1.)

KCWW also licenses the patents in suit to other entities such as KCC, foreign operations

that make use of the patents overseas, and non Kimberly-Clark entities including at least two

private-label manufacturers who manufacture products for various stores such as Wal-Mart and

6

other grocery stores. (Id. at 19:12-25, 20:13.)

As of the filing of this case, KCWW profited from the licensing of its intellectual property through a flat fee. (Id. at 25:8-15.) According to Mr. Wesley, the flat fee meant that "it didn't matter where the products were sold," KCWW was still going to get a flat fee for licensing them. (Id.)

Mr. Wesley testified to the relationship of KCWW to KCGS, calling them "sister corporations" (Id. at 7:2-10) that are 'separate legal entities,' (Id. at 44:2) each with its own board of directors and officers (Id. at 44:2-3) and both under the umbrella of KCC, "the ultimate parent entity." (Id. at 26:19.) Mr. Wesley estimated that KCWW derives less than a quarter of its revenue from its manufacturing relationship with Global Sales. (Id. at 27:7-14.) He further testified that KCWW gets "its most significant source of revenue," dividends and profits, from "foreign subsidiaries," most of which it owns. (Id. at 27:1-6.) Mr. Wesley also testified that KCWW has no "say in who the executives are at Global Sales" (Id. 23:12-14), nor does it "direct the sales force or the marketing efforts" of KCGS. (Id. at 43:21-25.) Mr. Wesley stated that KCWW does not "control the management of Global Sales," (Id. 22:13-14) and that it does not "tell Global Sales where to sell products." (Id. 22:14-15) Finally Mr. Wesley testified that KCWW exerts "trademark quality control" over KCGS. (Id. at 22:16-20.)

**Standard**

The procedural posture of this case is unusual. Because Defendant was less than forthcoming in its papers supporting its motion to dismiss, the Court held a hearing to flesh out facts necessary to decide the motion. Thus, this case is beyond the pleadings stage. It is only at the motion to dismiss for lack of personal jurisdiction stage that plaintiff's allegations constitute

7

a *prima facie* showing of personal jurisdiction, so as to survive a motion to dismiss. See, e.g.,
DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001). Once the case progresses
beyond the pleadings stage, the burden on the plaintiff to survive a motion to dismiss for lack of
personal jurisdiction becomes greater and "the prima facie showing must be factually supported."
Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990). However, the
outcome of this motion would be the same under either standard. Plaintiffs have not met either
the lesser "prima facie" standard or the greater "factually supported" standard.

**Personal Jurisdiction**

To determine personal jurisdiction in patent cases, this Court applies the law of the
Federal Circuit. See, e.g., Rates Tech. Inc. v. Nortel Networks Corp., 399 F.3d 1302, 1307 (Fed.
Cir. 2005); Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir.
1994). This principle applies equally to a declaratory judgment action for non-infringement
where the patentee is the defendant – like this action – because the issue of personal jurisdiction
is "intimately related to patent law." See Silent Drive, Inc. v. Strong Indus., Inc., 326 F.3d 1194,
1201 (Fed. Cir. 2003); Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995).

In general, personal jurisdiction over non-resident defendants is determined by the law of
the jurisdiction in which the district court sits. See PDK Labs v. Friedlander, 103 F.3d 1105,
1108 (2d Cir. 1997). Thus, for this court to have personal jurisdiction over a defendant, New
York law must provide a basis for exercising personal jurisdiction. See, e.g., Bank Brussels
Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir. 2002). If there is a
statutory basis for jurisdiction, the court must then determine whether New York's exercise of
jurisdiction would comport with federal constitutional standards of due process. Id.

8

Thus, the personal jurisdiction inquiry in this case consists of two steps: (1) whether the defendant is amenable to process in the forum state (*i.e.,* whether there is personal jurisdiction under the state long-arm statute); and (2) whether exercise of jurisdiction is constitutional. See, e.g., LSI Indus. Inc. v. Hubbell Lighting, Inc., 232 F.3d 1369, 1370 (Fed. Cir. 2000).

## A. This court does not have general jurisdiction over KCWW under New York's long-arm statute

KCWW does not transact business in New York in the manner envisaged by the state long-arm statute. Nor does KCWW transact business in New York through its purported agent, KCGS, which does transact business in New York, for general personal jurisdiction purposes.

### i. KCWW itself does not "Do Business" in New York under Section 301

Under the New York long-arm statute, general jurisdiction exists over non-residents "doing business" in New York. See NY CPLR § 301. The court may exercise personal jurisdiction over an out-of-state defendant if the defendant engages in "continuous and systematic" business activities within New York. See, e.g., Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir. 1983); see also, Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 415-16 (1984). In other words, the plaintiff must show that the defendant is doing business in New York "with a fair measure of permanence and continuity." See, e.g., Beacon Enters., 715 F.2d at 762. Courts describe this standard as stringent because "a defendant who is found to be doing business in New York in a permanent and continuous manner may be sued in New York on causes of action wholly unrelated to acts done in New York." Overseas Media, Inc. v. Skvortsov, 407 F. Supp. 2d 563, 567 (S.D.N.Y. 2006); see also Freeplay Music, Inc. v. Cox

9

Radio, Inc., 2005 U.S. Dist. LEXIS 12397, at *2 (S.D.N.Y. June 22, 2005) (citing Ball v.

Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 198 (2d Cir. 1990).

At its core, the standard for determining whether a defendant is doing business in New

York boils down to "presence." Overseas Media, 407 F. Supp. 2d at 567. The Second Circuit has

identified specific factors that New York courts have focused on when deciding whether a

defendant is present in New York for section 301 purposes. They include: "the existence of an

office in New York; the solicitation of business in the state; the presence of bank accounts and

other property in the state; and the presence of employees of the foreign defendant in the state."

Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985) (citing Frummer v.

Hilton Hotels Int'l., 19 N.Y.2d 533, 536 (1967) *cert denied*, 389 U.S. 923 (1967); Bryant v.

Finnish Nat'l. Airline, 15 N.Y.2d 426, 429 (N.Y. 1965); see also, Mantello v. Hall, 947 F. Supp.

92, 97 (S.D.N.Y. 1996).

Furthermore, "Mere sales of a manufacturer's product in New York, however substantial,

have never made the foreign corporation manufacturer amenable to suit in this jurisdiction."

Delagi v. Volkswagenwerk, 29 N.Y.2d 426, 433 (1972). Even if the Defendant sells products in

this district, it must do more – that is, it must satisfy the so-called "solicitation plus" test before

general jurisdiction will attach. Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir. 2000)

(solicitation of business plus minimal additional contacts constitutes "doing business").

KCWW does not solicit business in New York. It does not own property in New York. It

does not have employees or operations in New York. Additionally, KCWW is not licensed or

registered to do business in New York. In short, KCWW does nothing that the Second Circuit has

identified as relevant in determining whether a party is doing business in New York. While the

10

determination of whether a foreign entity is doing business in New York "is necessarily fact sensitive because each case is dependent upon its own particular circumstances," Landoil Resources Corp. v. Alexander & Alexander Svcs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990) (internal quotations omitted), the fact that KCWW does not fulfill a single criterion focused on by New York courts weighs heavily against this court finding that KCWW "does business" in New York for section 301 purposes.

Arquest relies on Wiwa, to argue that the central issue in determining whether a defendant is subject to general jurisdiction is "whether the defendant or its agent behaved in such a way so as to encourage others to spend money (or otherwise act) in a manner that would benefit the defendant." (Pls.' Opp. Mem. 7 (quoting Wiwa, 226 F.3d at 98).) That is not correct. The Second Circuit in Wiwa described what constituted "solicitation" in the context of the so-called "solicitation plus" rule. Wiwa 226 F.3d at 98. It is undisputed that KCWW does not solicit business in New York – KCGS does. Therefore, Wiwa is inapposite.

KCWW does indeed benefit from the activities of KCGS in New York. But a defendant will not be found to be doing business in New York simply "because an entity or person conducts activities in New York that ultimately inure to the defendant's benefit." 2-3 Weinstein Korn & Miller, New York Civil Practice: CPLR P § 301.16. If the law were otherwise, KCWW would be subject to general jurisdiction everywhere products bearing its intellectual property are sold.

Nor is there any "plus" for solicitation plus purposes. Even if KCGS' sale of KCWW's products in New York met the "solicitation" prong of the "solicitation plus" test, KCWW would have to have some other contact with New York in order to meet the test for "doing business" in New York. The record reveals none.

11

Accordingly, Defendant is not subject to general jurisdiction in New York under § 301.

### ii. KCWW does not "Do Business" in New York through an agent

Arquest tries to predicate general jurisdiction over KCWW on its contention that KCWW conducts business in this jurisdiction vicariously through KCGS. This argument, too, fails.

There are two specific theories upon which New York courts assert general jurisdiction over foreign corporations that are deemed to be doing business in New York vicariously: agency and "mere department" analysis. NY CPLR § 301 C301:9 (McKinney 2008).

As the Second Circuit stated in Wiwa, a court may assert jurisdiction over a foreign corporation, even if that corporation has performed no activities in New York itself, when it "affiliates itself" with an entity that "renders services in New York on behalf of the foreign corporation." Wiwa, 226 F.3d at 95. But these activities must be "sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." Id. The plaintiff need not prove the existence of a formal agency agreement, and the defendant need not exercise direct control over the purported agent. But the agent or representative must be "primarily employed by the defendant and not engaged in similar services for other clients." Id.

The "seminal agency jurisdiction cases," Wiwa, 226 F.3d at 96, in this Circuit are Gelfand v. Tanner Motor Tours, Ltd., 385 F.2d 116 (2d Cir. 1967) and Frummer v. Hilton Hotels Int'l., Inc., 19 N.Y. 2d 533 (1967). In both Gelfand and Frummer, the relationship that existed between the defendant and the entity deemed its agent for jurisdictional purposes differed significantly from the relationship between KCWW and KCGS. In both cases, the defendant's purported agent worked "on behalf of" the defendant. Wiwa, 226 F.3d at 95. KCGS does not do business in New

York "on behalf of" KCWW. It does business "on behalf of" itself, selling products that it has retained affiliated and unaffiliated manufacturers, including KCWW, to produce.

In Gelfand, the Second Circuit found that jurisdiction existed over the defendant, a Grand Canyon tour operator, through the defendant's relationship with an independent agency in New York that promoted the defendant's tours and confirmed passenger bookings for the tour. Gelfand, 385 F.2d at 118-19. The facts of Gelfand differ crucially from those of this case. In Gelfand, the defendant's arrangement with the independent reservation agency in New York was the *only way* to merchandise the tour. Without that agency arrangement, "the defendant would either have had to open their own reservation office in New York or give up the Grand Canyon tour." Gelfand 385 F.2d at 121.

In contrast, KCWW would not have to shut down its operations or succeed KCGS in New York in order to continue manufacturing Huggies and licensing its intellectual property. To be sure, the New York market for diapers and training pants is of sufficient importance - there are enough baby and toddler bottoms in New York to cover - that I would not credit KCWW if it asserted that it would walk away from the market if KCGS were to suddenly cease sales and distribution operations in New York. However there is no evidence that KCWW would get into the sales business if KCGS disappeared. Rather, "Kimberly-Clark Corporation" or some other entity "would find a way to sell the product." (Tr. 39:19 - 40:1). There is no evidence that KCWW *itself* would "perform equivalent services" if KCGS were not available to retain KCWW to manufacture its products. KCWW does not sell or market any products. (Id. at 18:16-18.)

Frummer is also distinguishable from this case. In Frummer, defendant Hilton Hotels International was found to be doing business in New York through its subsidiary, Hilton

13

Reservation Services. Frummer, 19 N.Y. 2d 533 (1967). The court found that Hilton Reservation Services performed public relations and publicity work for the defendant, Id. at 537, and as in Gelfand, it accepted and confirmed guest reservations for the Hilton Hotel in London. Id. at 533. Thus, in both Gelfand and in Frummer, the purported agent through which the court exercised jurisdiction over the defendant "had the power to bind the defendant," 2-3 Weinstein Korn & Miller, New York Civil Practice: CPLR P § 301.16, by taking and confirming reservations *on its behalf.* The fair implication of Frummer and Gelfand "is that in order for a sufficient agency to be found for jurisdictional purposes, the agent must be a substantial participant in the defendant's actual business and have the discretion and authority to bind the defendant." NY CPLR § 301 C301:9 (McKinney 2008).

KCWW and KCGS do not enjoy such a relationship. KCGS does not have the power to bind KCWW, nor does it act on behalf of KCWW in New York. It retains KCWW to manufacture its products and sells those products to others.

The facts in this case are far more analogous to those in Delagi v. Volkswagenwerk 29 N.Y.2d 426, 433 (1972). There, the New York Court of Appeals found that the defendant, foreign automobile manufacturer, Volkswagenwerk AG ("VWAG"), did not do business vicariously in New York for jurisdictional purposes. Delagi 29 N.Y.2d at 426-27. VWAG manufactured automobiles in Germany, which it exported to the U.S. through its wholly owned subsidiary, Volkswagen of America ("VWoA"), located in New Jersey. Id. at 430. VWoA then sold the automobiles to a franchised wholesale distributor, World-Wide Volkswagen Corp. ("World-Wide"). Id. World-Wide took possession of the automobiles in New Jersey and resold them to local Volkswagen dealers in New York, New Jersey and Connecticut. Id. The plaintiff in Delagi

14

sued VWAG, alleging jurisdiction based on VWAG's engagement "in a systematic and regular course of business in New York." Id. The court concluded that it could not exercise jurisdiction over VWAG based on its relationship with World-Wide, because the two companies were "truly separate corporate entities." Id. at 431.

Like VWAG, KCWW manufactures products and has a relationship with a "truly separate corporate entity," KCGS, that sells those products in New York. KCWW and KCGS are separate legal entities, with their own board of directors, officers and employees. (Tr. 44:2.) There is no basis in the record before me to pierce the corporate veil. This court will therefore not infer an agency relationship between KCWW and KCGS.

The second theory under which courts in this district exercise vicarious jurisdiction is the "mere department" theory, whereby a subsidiary is a mere department of its parent corporation, "When the activities of the parent show a disregard for the separate corporate existence of the subsidiary" Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984). KCGS is not a mere department of KCWW.

First, most, if not all, of cases involving the mere department theory invoke the theory when determining if a *subsidiary* can be deemed a mere department of its *parent*. See Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181 (2d Cir. 1998); Koehler v. Bank of Bermuda Ltd., 101 F.3d 863 (2d Cir. 1996); Beech Aircraft, 751 F.2d 117; Klonis v. Nat'l Bank of Greece, 492 F.Supp. 2d 293 (S.D.N.Y 2007); Delagi 29 N.Y.2d 426. KCWW and KCGS are not parent and subsidiary; they are "sister" corporations with a common parent.

However, even assuming that one corporation can be a mere department of its sister corporation (or a related corporation other than a parent), KCWW and KCGS meet only one of the

15

four tests that courts apply in determining whether one entity is a mere department of another –
and the least important one at that. These factors are: 1) common ownership 2) financial
dependency 3) the degree to which the parent corporation interferes with the selection and
assignment of the subsidiary's executive personnel and fails to observe corporate formalities and
4) the degree of control over the marketing and operational policies of the subsidiary exercised by
the parent. Klonis, 492 F.Supp. 2d at 300.

KCWW and KCGS are both owned by Kimberly Clark Corporation. But common
ownership is not a sufficient condition for mere department status. Hvide Marine Int'l., Inc. v.
Employers Ins. of Wausau 724 F.Supp. 180, 186-87 (S.D.N.Y. 1989). The Second Circuit has
stated:

> The officers of any corporation that owns the stock of another necessarily exercise a
> considerable degree of control over the subsidiary corporation and the discharge of
> that supervision alone is not enough to subject the parent to New York jurisdiction.
> However, when the activities of the parent show a disregard for the separate corporate
> existence of the subsidiary, New York jurisdiction may be asserted.

Beech Aircraft, 751 F.2d at 120. Thus, in addition to common ownership, there must be a
disregard for separate corporate existence. There is no evidence of any such disregard in the
record.

The record indicates that KCGS is not financially dependent on KCWW. The type of
financial dependency envisioned by this factor is found in Beech Aircraft where the subsidiary
was found to be "wholly dependent upon [its parent's] financial support to stay in business."
Beach Aircraft, 751 F.2d at 121. In Beach Aircraft, the parent owned 100% of its subsidiary's

16

stock and provided it with at least 71% of its debt in one year, including a no interest "loan" with no payment date. Id.

In this case, KCGS pays KCWW both to manufacture its products (under a cost-plus arrangement) and to license KCWW's intellectual property. There is no indication of any other financial arrangements between the two companies. KCWW is not financially dependent on KCGS; Mr. Wesley estimates that KCWW derives less than a quarter of its revenue from its manufacturing relationship with Global Sales. (Tr. 27:7-14.) KCWW obtains "its most significant source of revenue," dividends and profits, from "foreign subsidiaries," most of which it owns. (Tr. 27:1-6).

The record further establishes that KCWW does not interfere with the selection and assignment of KCGS's executive personnel, nor does it show that KCWW fails to observe corporate formalities. KCWW has no "say in who the executives are at Global Sales." (Tr. 23:12-14.) The two companies are separate legal entities, each with its own board of directors and officers. (Id. at 44:2.) Even though Mr. Wesley is an officer of both KCWW and KCGS, and testified that the two entities 'coordinate,' (Id. at 43:17-20), the "mere department" standard requires not just coordination and overlap but, "pervasive control," Jazini 148 F.3d at 185, of one company by the other. There is no evidence of said control on the record before me.

The final factor in determining "mere department" status is the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. Again, the record does not indicate "control" on the level required for "mere department" status. Mr. Wesley testified that KCWW "does not direct the sales force or the marketing efforts" of KCGS, (Tr. 43:21-25), or "tell Global Sales where to sell products." (Tr. 22:14-15). Mr. Wesley also testified

17

that KCWW exerts "trademark quality control" over Global Sales (Id. at 22:16-20) but this is not

the "pervasive control" of corporate affairs necessary to constitute "mere department" status.

Jazini, supra, at 185. It is, rather, a requirement of trademark law that the holder of a mark police

the use of its products by others.

Thus KCGS is not a "mere department" of KCWW.

Because this court cannot exercise jurisdiction over KCWW under either theory of

vicarious presence, it finds no personal general jurisdiction over KCWW.

### B. The Court lacks specific jurisdiction over KCWW

Neither will this court exercise specific jurisdiction over KCWW pursuant to NY CPLR §

302(a)(1).

According to the Second Circuit, a New York court may exercise jurisdiction over a non-

domiciliary defendant who "in person or through an agent . . . transacts any business within the

state and the cause of action arises out of the transactions." PDK Labs,  103 F.3d 1105, 1109 (2d

Cir. 1997)(internal quotations omitted). KCWW has undertaken no activity in New York that

gives rise to specific jurisdiction over a declaratory judgment action. In their answering brief,

Plaintiffs identify the "transaction of business" that gives rise to specific jurisdiction as follows:

"KCWW's counsel purposefully projected itself into this district by reaching out to Arquest's

New York counsel to threaten a patent infringement lawsuit." (Pls.' Opp. Mem. 9.) Plaintiffs

analogize this to the conduct of the out of state defendant in PDK Labs, where jurisdiction

attached when "the out-of-state defendant *used New York counsel* to mount a three-month-long

campaign to threaten a patent infringement action against the New York-based plaintiff and to

18

solicit an investment in the defendant." Id. (citing PDK Labs, 103 F.3d at 1106-09) (emphasis added).

Plaintiffs' analogy to PDK Labs fails. In PDK Labs, the out-of-state defendant engaged New York counsel and used them to threaten an infringement suit. Here, by contrast, the out of state defendant's lawyers are *not* based in New York, but rather in Wisconsin. The location of Arquest's lawyers is of no relevance. Plaintiffs are implying that they can create jurisdiction by hiring lawyers located in New York, so that out of staters must choose between subjecting themselves to jurisdiction in New York (by communicating from out of state with counsel) or refraining from negotiations altogether. Seemingly acknowledging the untenable nature of this argument, Plaintiffs make no mention of specific jurisdiction in their supplemental brief, and appear to have abandoned this argument.

## C. Minimum Contacts

Because this court finds no specific or general jurisdiction over KCWW, it need not address the constitutional requirements for personal jurisdiction.

## Conclusion

For the foregoing reasons, defendant's motion to dismiss for lack of personal jurisdiction is GRANTED.

Dated: New York, New York

July 31, 2008

_____

U.S.D.J.

BY ECF TO ALL COUNSEL